666                                16 Mass. App. Ct. 666

Young Men's Christian Association of Quincy *v.* Sandwich Water District.

THE YOUNG MEN'S CHRISTIAN ASSOCIATION OF QUINCY
*vs.* SANDWICH WATER DISTRICT.

Barnstable.  November 16, 1982. — September 28, 1983.

Present: ARMSTRONG, ROSE, & PERRETTA, JJ.

*Eminent Domain,* Damages.  *Evidence,* Value, Expert opinion.

In an action for assessment of damages arising from a taking by eminent domain of a parcel of land, it was within the discretion of the judge to admit in evidence an opinion of value based on the income capitalization method despite the availability of reliable comparable sales data. [668-669]

In an eminent domain proceeding, the judge did not abuse his discretion in permitting the jury to take into account the value of the locus for use as a water resource, although such use was forbidden under the zoning by-law, where the by-law expressed a liberal policy for granting special permits for such use and such permits had been granted in the past.  [669-670]

At the trial of an eminent domain proceeding, the judge erred in permitting the jury to consider expert testimony concerning the value of the locus based on income capitalization where it was apparent on the record that the expert based his opinion on capitalization of gross, rather than net, income and where there was no evidence warranting a conclusion that gross and net income would be substantially identical. [670-673]

At the trial of an eminent domain proceeding before a judge sitting without a jury, the judge erred in basing his finding of the value of the locus on capitalization of gross income to be derived from use of the land as a source of water and in subtracting a sum for "the cost of making water available for distribution" from the capitalization figure rather than from gross income.  [673-675]

In an eminent domain proceeding certain opinions of the value of the locus as a potential source of water were misdirected in that they valued the water that was to be produced from wells on the locus, rather than the land that was taken.  [675-677]

CIVIL ACTION commenced in the Superior Court on September 26, 1977.

The case was tried before *Travers, J.*

*Philip M. Boudreau* (*Arthur Van C. Lanckton* with him) for the defendant.

*James G. Walsh, Jr.,* for the plaintiff.

ARMSTRONG, J.  On August 12, 1977, the defendant (district) took by eminent domain 41.51 acres of land which was part of a 525-acre campsite belonging to the plaintiff and located in South Sandwich.  The portion of the campsite taken by the district was undeveloped and wooded and had access only by dirt road.  Prior to the taking, the land had been tested for well sites by a private consulting firm, and the district contemplates locating three wells on the property, each capable of pumping 700 gallons per minute.  One such well was in fact in operation by the time of trial.  The plaintiff brought this action for damages under G. L. c. 79, § 14, and a jury found in its favor in the amount of $1,500,000.[1]  The judge denied the district's motion for a new trial.  The case is before us on the district's appeal.

The evidence concerning the value of the land (locus) taken by the district was sharply conflicting.[2]  It came from three sources.  One source was the opinions of three real estate appraisers based on comparable sales data.[3]  These

---

[1] The judgment was in the amount of $1,748,736, reflecting the addition of interest ($340,736) and subtraction of the pro tanto payment ($92,000).

[2] One of the appraisers formulated his opinion in terms of the value of the plaintiff's camp before and after the taking.  See *Kane* v. *Hudson*, 7 Mass. App. Ct. 556, 559-560 (1979).  The other opinions were formulated in terms of the fair market value of the portion taken.  There is no contention that the plaintiff's land has suffered a diminution in value in addition to the loss of the locus.

[3] The principal sales used by the appraisers were (1) a 130-acre parcel located a few hundred feet away from the locus, which was sold within a week of the taking for $350,000, or $2,692 per acre; (2) a parcel of 43 acres a mile east of the locus, sold in January, 1975, for $120,000, or $2,800 per acre; (3) a parcel of 27 acres sold in February, 1975, for $76,000, or $2,800 per acre; (4) a parcel of 46 acres abutting the plaintiff's property on the north, sold in January, 1974, for $106,600, or $2,300 per acre; and (5) a parcel of 387 acres southwest of the locus, sold in December, 1972, for $965,000, or $2,500 per acre.  The fifth parcel had a functioning well of a million-gallons per day capacity.  The third parcel had been tested posi-

opinions, introduced by the defendant, ranged from $96,000 to $129,000. A second source, introduced by the plaintiff, was the finding of the judge sitting without jury in a prior trial (see G. L. c. 79, § 22, as appearing in St. 1973, c. 983, § 1) valuing the property at $850,000. The third source, introduced by the plaintiff, was the opinion of one Coleman, a real estate appraiser, based on capitalization of anticipated income from the land if used as a water resource. His opinion of value was $1,200,000. It is apparent from the record that the jury's finding of $1,500,000 could only have been based upon extrapolation from the Coleman opinion[4] and that the verdict must fall if that opinion should have been excluded from evidence.

## I.

The district argues that it was error for the judge to permit expert opinion based on capitalization of income without a showing that it was impossible or impracticable to determine the value of the locus by reference to comparable sales. The cases do not seem to support such a rule. Where net income attributable to real property can be reliably predicted, the two approaches, both being based on market data, should produce roughly comparable results with respect to certain kinds of commercial properties, because the sales prices of such properties are presumably based on their

---

tively for a well of similar capacity. The first parcel was bisected by a paved road and had about 2,000 feet of frontage on both sides. The second had 1,684 feet of frontage on a paved road. There was evidence that the highest per-acre selling price ever paid in South Sandwich for parcels larger than one or two acres was a sale of 15 acres in July, 1976, for $69,000, or $4,600 per acre. It was laid out as a half-acre subdivision, had four lots on a paved road, had electric service, and was predominantly level in terrain. The parcels treated as comparable to the locus were like the locus, in a one-acre residential zone and were uneven in terrain.

[4] The Coleman opinion, as will be seen later in our decision, was based upon the anticipated output of two of the three proposed wells. In denying the district's motion for a new trial, the judge ruled that the jury could have thought Coleman too conservative in his approach and allowed something additional for the anticipated output of the third well.

16 Mass. App. Ct. 666                         669

Young Men's Christian Association of Quincy v. Sandwich Water District.

income-producing potential. The cases which demand a preliminary showing that comparable sales data cannot produce a reliable guide to value have been concerned with the proposed use of depreciated-reproduction-cost evidence, an approach to valuation which, unlike the other two (when properly applied), departs from the relative objectivity of a market-data basis. See, e.g., *Davenport* v. *County of Franklin*, 277 Mass. 89, 92-93 (1931); *Tigar* v. *Mystic River Bridge Authy.*, 329 Mass. 514, 515-518 (1952); *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.*, 335 Mass. 189, 195 (1956); *Commonwealth* v. *Massachusetts Turnpike Authy.*, 352 Mass. 143, 145, 147-149 (1967); *Correia* v. *New Bedford Redevelopment Authy.*, 375 Mass. 360, 366-368 (1978); *Silk* v. *Commonwealth*, 1 Mass. App. Ct. 149, 152-154 (1973). We hold that it at least lies within the discretion of the judge to admit in evidence opinions of value based on the income capitalization method despite the availability of reliable comparable sales data. It is not unusual for the two to be used in concert. See *Correia* v. *New Bedford Redevelopment Authy.*, 5 Mass. App. Ct. 289, 294 (1977), *S.C.*, 375 Mass. at 360.

## II.

The district contends that Coleman's capitalized income opinion should have been excluded because, under the zoning applicable to the locus, use of the premises as a commercial water resource was forbidden. It is true, as the district argues, that "[c]are must be taken to distinguish 'between availability for public use which constitutes availability even in private hands and availability which is peculiar to the government.'" *Roach* v. *Newton Redevelopment Authy.*, 381 Mass. 135, 139 (1980), quoting from 4 Nichols, Eminent Domain § 12.315, at 12-403 (rev. 3d ed. 1979).

The evidence on this point was as follows. The locus was zoned for low density residential use, but land in the district could be used for commercial water supply purposes if a special permit were obtained from the board of appeals.

The Town of Sandwich Zoning By-law, art. I, § 1330 (1973), provided that "[s]pecial [p]ermits shall normally be granted unless, because of a condition peculiar to the particular case but not generally true for similar permitted uses on other sites in the same district, it appears that nuisance, hazard, or congestion will be created, or for other reasons there will be substantial harm to the neighborhood or derogation from the intent of the [b]ylaw, or that the stated district objectives will not be satisfied." There was no evidence of conditions peculiar to the locus which would threaten nuisance, hazard, congestion, or substantial harm to the neighborhood if the locus were to be used for water supply purposes; and there was evidence that other land in the district (the land which was the subject of the fifth comparable sale mentioned in note 3, *supra*) had been permitted to operate commercially as a water source.

In determining whether a use barred by law, or subject to restriction, is sufficiently "likely to eventuate and so imminent as to deserve being taken into account" by the finder of fact, "the judge has a margin of ultimate discretion." *Skyline Homes, Inc.* v. *Commonwealth,* 362 Mass. 684, 687 (1972). *Roach* v. *Newton Redevelopment Authy., supra* at 136-137. *Colonial Acres, Inc.* v. *North Reading,* 3 Mass. App. Ct. 384, 386-387 (1975). In view of the liberal tenor of the by-law with respect to special permits and the fact that such use had been sanctioned in the past, it cannot be concluded that the judge abused his discretion in permitting the jury to take into account the value of the locus for use as a water resource.

### III.

Despite the admissibility, as an abstract proposition, of opinions of value based on income capitalization (compare, in this respect, *Lic, Inc.* v. *Hudson,* 10 Mass. App. Ct. 815 [1980]), the Coleman opinion was based on a misapplication of the income-capitalization method of valuation and lacked, for that reason, the theoretical reliability which

would justify its being submitted to the jury for their assistance in determining damages. If the deficiencies in the opinion were not at first apparent, they had become so by the conclusion of his testimony, and the judge erred in not allowing the defendant's motion to strike the opinion at that point.

The principal defect in the Coleman opinion is that he capitalized gross, rather than net, income. Coleman deflected cross-examination on the point with formidable verbal agility, but the transcript when scrutinized leaves no doubt that his opinion was based on capitalization of gross income.

His method of calculation was as follows. The property was tested for three wells, each of which was rated for seven hundred gallons per minute. The yield per hour per well (700 × 60) would be 42,000 gallons. The yield per day per well (42,000 × 24) would be 1,008,000 gallons. The yield per year per well (1,008,000 × 365) was figured to be 367,920,000 gallons. Coleman then multiplied that figure by $200 per million gallons, which he testified was the unit value of water at wholesale rates in the South Sandwich area.[5] The resultant figure (367,920,000 × .0002), or $73,584, was the "net income" (Coleman's characterization) attributable to the use of one well. This he capitalized at a twelve percent rate to arrive at "the fair market value of well no. 1", or ($73,584 ÷ .12) $613,200. Proclaiming his method "conservative," Coleman allowed for one third down time,[6] and thus multiplied the value-per-well figure by two wells rather than three to arrive at the value of the property: two times $613,200, or $1,226,400, which he

---

[5] Retail rates at the time of the taking showed wide variation: $416 per million gallons in Sandwich; $602 in Harwich; $418 in Falmouth; $508 in Chatham; $520 in Orleans; $453 in Provincetown; $508 in Dennis; $887 in Yarmouth. Retail rates presumably take into account the amortized capital cost of the retail distribution system and the various costs (personnel, meters and other equipment, fuel, supplies, postage, etc.) associated with the maintenance and billing functions.

[6] There was no testimony bearing on whether the wells could be capable of round-the-clock operation for indefinite periods. There was testimony to the effect that the existing wells of the Sandwich Water District are in operation on the average twenty-two to twenty-eight percent of the time.

rounded off to $1,200,000. This was the opinion which went to the jury and was the opinion which all parties presume the jury relied on in finding the value of the property to have been $1,500,000 at the time of the taking.[7]

Despite Coleman's characterization of the $73,584 figure as "net income," it is clear that it is a gross income figure. It is the product of units sold and the selling price per unit. By definition that is gross income. Such a figure cannot be used as a valid basis for capitalization unless one can reasonably assume that there will be no expenses required to generate the sales. There was no evidentiary basis for such an assumption in this case.[8] The record suggests that there will be at least three categories of cost involved in producing the water: (1) the amortized capital cost of well drilling, pumping equipment and housing, pipes, water storage, and maintenance equipment;[9] (2) the salaries and supplies for maintenance personnel; and (3) power to run the pumps. According to the district's superintendent, the power cost alone of running one of the district's existing wells ranged from $800 to $900 per

[7] The fact that a jury may come back with a figure higher than the opinion of any witness does not necessarily imply that its verdict is excessive. See *Loschi v. Massachusetts Port Authy.*, 361 Mass. 714, 716-716 (1972). As mentioned in note 4, *supra*, the judge, in denying the defendant's motion for a new trial, reasoned that the jury may have thought Coleman too conservative in allowing for one third down time. Compare nn. 6 and 10.

[8] Under cross-examination the witness stated that the "net income" concept did not take cost of production into account because he was not valuing a water business and that the income-producing potential of the land for water production purposes should be conceptualized in terms of the rent chargeable by a landlord who leases the land to a water producer under "a pure net lease"; but it is clear that Coleman's income figure was not derived from evidence of comparable rentals and that a water producer leasing the land could not be expected to agree to pay the lessor his entire gross income as rent on an ongoing basis.

[9] The consultant on whose report the district based its taking of the locus estimated that the construction costs of the three phases of development of the well field would run $6,440,000. The estimate was made in 1972, does not appear to involve capital costs of the retail distribution system, but does appear to involve water main extensions which might or might not be applicable to a hypothetical commercial water-wholesaling operation, depending on who its customers might be.

16 Mass. App. Ct. 666                                    673

Young Men's Christian Association of Quincy v. Sandwich Water District.

month in the winter to $2,000 to $2,500 per month in the summer.[10]

The capitalization of income approach to valuation presupposes, of course, capitalization of "net," not "gross," income. *Correia* v. *New Bedford Redevelopment Authy.*, 5 Mass. App. Ct. at 294. 5 Nichols, Eminent Domain §§ 19.1, 19.23 & n.2 (rev. 3d ed. 1981). Because there was no reliable evidence from which a finding could be made as to the likely costs of construction and operation of the wells in question, the record furnishes no evidentiary basis for assuming there would be any "net income" based on a selling price of $200 per million gallons. Thus the question for decision is whether the fact that the Coleman opinion was based on capitalization of gross income goes merely to its weight or whether a judge is required to exclude such an opinion altogether. We hold that it is error for a judge to permit an appraisal based on capitalization of gross income to be put before a jury in the absence of evidence warranting a conclusion that gross income will be substantially identical to net income.

## IV.

For similar reasons the finding of the judge sitting without a jury was based upon error of law, and the admission of that finding in evidence would independently require reversal.[11] Although the evidence at the first trial

---

[10] The power costs per well would doubtless be significantly higher if the three new wells were to be operated two thirds of the time, the assumption on which Coleman's valuation was based. As mentioned in note 6, *supra*, the district's existing wells were operated only twenty-two to twenty-eight percent of the time.

[11] The procedure which prevailed under G. L. c. 79, § 22, as in effect at the time of both trials required the judge presiding at the jury trial to allow admission of the first judge's finding in evidence although he might disagree with the first judge's rulings of law. *Roach* v. *Newton Redevelopment Authy.*, 381 Mass. at 137-138. Unless the first judge reports the matter for interlocutory decision, the correctness of his rulings of law cannot be reviewed until the case has gone to judgment following the jury trial. *Haufler* v. *Commonwealth*, 372 Mass. 527, 529-530 (1977). Because the judge at the jury trial cannot properly exclude the first judge's finding, the party against whom the finding is offered is not required to

is not before us, error is apparent on the face of the decision. There the judge recites his acceptance of the Coleman opinion in the form set out above, but then, apparently mindful of the fact that it was predicated on gross income, modifies it by subtracting "the cost of making water available for distribution, which I estimate to be $350,000." The flaw in the opinion is not so easily rectified. Even if we assume (as we must) that there was a basis in the evidence for the expenses figure of $350,000, nevertheless, in a correct application of the income-capitalization method, expenses must be subtracted from gross income, not from the capitalization figure. Here we do not overlook the possibility that the judge may have had in mind nonrecurring capital expenditures (well-drilling, pumping equipment, distribution mains, and the like) which might properly, in some instances, be directly offset against the value of the land when improved for a particular use in order to arrive at the value of the land when unimproved; but on such a hypothesis, the judge's decision necessarily involves an implicit assumption that the water will be produced with no expenses of operation. We think that so improbable an implied finding is not to be sustained under a statute which requires (as § 22 then

object to its admission, and might even (as here) stipulate to its admission, without waiving his right to appellate review. *Roach* v. *Newton Redevelopment Authy.*, 8 Mass. App. Ct. 618, 623 n.9 (1979), *S.C.*, 381 Mass. at 138. At the time the *Haufler* and *Roach* cases were decided, an error in the first judge's decision which erroneously affected the judgment necessitated further proceedings before the judge sitting without a jury as well as before the jury. See the *Haufler* case, 372 Mass. at 530, and the *Roach* case, 381 Mass. at 138. The Legislature has since amended G. L. c. 79, § 22, to "eliminate a compulsory first trial without jury and . . . to provide for 'one trial before a jury, unless all parties waive trial by jury and file a written agreement requesting a trial without a jury.'" *Heddendorf* v. *Commonwealth*, 13 Mass. App. Ct. 584 n.1 (1982), quoting from St. 1981, c. 800, § 2. That principle is unaffected by the most recent amendment to § 22. See St. 1982, c. 634, § 8. Because § 22 is procedural in nature, its present form will govern retrial. *City Council of Waltham* v. *Vinciullo*, 364 Mass. 624, 626-628 (1974). *Porter* v. *Clerk of the Superior Court*, 368 Mass. 116, 118 (1975). *Goes* v. *Feldman*, 8 Mass. App. Ct. 84, 88-89 (1979). Thus, on remand, further proceedings, if any, will consist of a single trial, and no question can recur arising from the admission in evidence of a judge's finding in a previous trial.

did) that the judge set out explicitly the material facts which underlie his decision. The principle is of familiar application. See, e.g., *Birnbaum* v. *Pamoukis,* 301 Mass. 559, 561-562 (1983); *Shapiro* v. *State Farm Mut. Ins. Co.,* 355 Mass. 54, 55-57 (1968); *Bruno* v. *Bruno,* 384 Mass. 31, 35 (1981) ("[Under Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), if] a judge has made findings of fact, an appellate court may not treat the judgment as importing a finding of all facts, open on the evidence, needed to support the judgment") & n.5; *Schrottman* v. *Barnicle,* 386 Mass. 627, 638-639 (1982); *Lynn* v. *Nashawaty,* 12 Mass. App. Ct. 310, 314-315 (1981).

## V.

Both the Coleman opinion and, derivatively, the first judge's decision were fundamentally misdirected in that they valued the water that was to be produced from the wells rather than the land that was taken. The rule is clear. "The market value to which the petitioner was entitled was made up of the value in the market of the land apart from its special adaptability for water supply purposes, plus such sum as a purchaser would have added to that value because of the chance that the land in question might some day be used as a water supply. *Moulton* v. *Newburyport Water Co.,* 137 Mass. 163 [1884]." *Sargent* v. *Merrimac,* 196 Mass. 171, 174 (1907). The difference is not merely semantic. All parties agree that the entire South Sandwich area is underlain by a geological formation known as the Mashpee Pitted Outwash Plain, a layer of glacial sand and gravel hundreds of feet thick permeated with water, and with a water table fifty to sixty feet above sea level. In essence, this means that all of South Sandwich (together with many other Cape Cod towns) sits atop a massive groundwater reservoir, access to which is not exclusive to the plaintiff's land but is the common heritage of whole communities. There was evidence (see note 3, *supra*) that large unimproved tracts of land in the vicinity of the plaintiff's camp had sold in the recent past for prices ranging from $2,300

to $2,800 per acre. Some of those tracts had functioning wells with drawing capacity equal to or in excess of those projected for the locus. If, as the judge could find on the evidence, the plaintiff's land was particularly well suited for drawing the water, the appropriate measure of that advantage was the difference in cost between drawing the water from the locus and drawing the same water from other suitable tracts. As to that difference, there was no evidence and no basis for a finding. Instead, the jury were permitted to attribute to the plaintiff's land the value of the entire water output the District might draw from the wells to be located thereon, in the same manner as if the plaintiff's land were the sole access point to the water of the underground reservoir.[12] There was evidence in *Lic, Inc.* v.

[12] The basis for computation of the value of the water was, of course, Coleman's opinion that $200 per million gallons was a fair price for water at wholesale in South Sandwich. That testimony fell short of establishing a market value for the water. The small number of water producers, the fact that many of them are governmental rather than commercial, the almost exclusively local character of the distribution and the wide divergences in prices charged in the handful of inter-municipal sales testified to by Coleman tend to suggest that water may not have a "market price" determined by the usual supply and demand considerations but may instead have a price based on recovery of the cost of production. If this is the case, the income-capitalization approach would be of dubious validity. See *Gloucester Water Supply Co.* v. *Gloucester*, 179 Mass. 365, 382 (1901). The income-capitalization method is most often applied to rental properties, where the relatively large number of comparable units on the market provides a reliable guide to market value.

The testimony of several witnesses suggested that the significance of the prices charged for the several inter-municipal sales testified to by Coleman might turn on whether those sales represented basic and on-going needs of the purchasing communities, decided on after evaluation of competing sources of supply, or instead represented emergency or occasional peak-day needs. The evidence indicated that the rule of thumb in small communities serviced by municipal wells is that a community needs enough wells to supply the highest expected peak-day demand with its largest well out of service. Demand is expected to peak in the summer in hot, humid weather, and peak demand will be three or more times the community's average daily demand. This suggests that the capital cost of providing peak-day production capability will substantially exceed the capital cost of providing average-day production capability and that a community might in some instances economize by supplying its peak-day demand by purchases from neighboring communities despite a price-per-unit-purchased substantially in excess of its own unit cost of production.

*Hudson, supra,* that such a situation existed in that case, but the evidence here was totally to the contrary.

If the taken land had been valued on the basis of comparable sales data, we could not have sustained an award in excess of roughly $3,000 per acre. The jury has awarded the plaintiff $36,135.87 per acre. What apparently gave the plaintiff's land its special value in Coleman's formulation is the fact that the District selected it as the location for its wells. If the District had selected instead some other parcel, that parcel, by the Coleman method, would have bestowed on it the value of the water in the reservoir, and the plaintiff's land would be relegated again to a value in the order of $3,000 per acre. It should be evident that the award cannot be sustained without flying in the face of the long-established principle that the owner of the land which is taken is not to receive any enhancement in value based on the contemplated improvement. See *Benton* v. *Brookline,* 151 Mass. 250, 257-258 (1890); *Cole* v. *Boston Edison Co.,* 338 Mass. 661, 665-666 (1959); *Malden Equip. Corp.* v. *Malden Redevelopment Authy.,* 353 Mass. 495, 497 (1968); *Roach* v. *Newton Redevelopment Authy.,* 381 Mass. at 137.

### VI.

The judgment is reversed, and the case is remanded for further proceedings not inconsistent herewith.

*So ordered.*