DAVID L. KRUTIAK & another[1] *vs.* TOWN OF CHESHIRE.

No. 06-P-1360.

Berkshire. April 4, 2007. - March 14, 2008.

Present: GELINAS, COHEN, & SIKORA, JJ.

*Practice, Civil,* Record, Waiver, Instructions to jury. *Evidence,* Value, Expert opinion. *Eminent Domain,* Damages. *Municipal Corporations,* Water supply.

No prejudice arose from the reconstruction, after trial, of lost testimony in an eminent domain case. [390-391]

In an eminent domain case, the defendant town, despite failing to move for a directed verdict or for judgment notwithstanding the verdict, preserved the sufficiency of evidence as an appellate issue, where the town did mount and maintain a challenge to the sufficiency of evidence throughout the trial by alternate means. [391-392]

In an eminent domain case, the trial judge correctly instructed the jury on the standard for valuation of the land taken as enhanced by its particular suitability for furnishing a public water supply, and the evidence presented by the landowners at trial abundantly satisfied that standard [394-396]; further, the judge correctly instructed the jury that they were permitted to consider such a use of the land, although that use was restricted at the time of taking, where the evidence demonstrated that the landowners enjoyed a reasonable prospect of a waiver or variance from that restriction [396-398], and the judge's instructions adequately safeguarded against the danger of valuation inflated by the public purpose of the taking [398].

CIVIL ACTION commenced in the Superior Court Department on February 26, 2001.

The case was tried before *Daniel A. Ford,* J.

*Philip M. Cronin (Edmund R. St. John, III,* with him) for the defendant.

*John J. Egan (Robert L. Quinn* with him) for the plaintiffs.

SIKORA, J. In this eminent domain case we consider the standards for valuation of land enhanced by its capacity to furnish a public water supply. In April of 1998, the defendant town of

[1]Karen A. Krutiak.

Cheshire (town) made a partial taking of a rural tract of approximately twenty acres owned by the plaintiffs David and Karen Krutiak (Krutiaks or plaintiffs). The town took the eastern half of the tract (parcel two) comprised of 10.078 acres and an access easement for a roadway over the western half (parcel one) of the tract. The purpose of the taking was the creation of a new groundwater well supply for the municipality. The town extended pro tanto compensation of $33,000 to the Krutiaks. In February of 2001, the Krutiaks commenced suit for an assessment of damages.[2] At the conclusion of a six-day trial in June of 2004, a Superior Court jury returned a verdict for damages of $555,000. The town has appealed from the resulting judgment upon grounds that the trial judge failed to enforce the valuation standards for water-bearing land established by the leading precedent of *Young Men's Christian Assn. of Quincy* v. *Sandwich Water Dist.*, 16 Mass. App. Ct. 666 (1983) (*YMCA*), and that the landowners' evidence failed to meet those standards. The record demonstrates that the rulings and jury instructions of the judge and the evidence of the plaintiffs fully satisfied the requirements of the case law. We therefore affirm.

*Factual background.* The evidence permitted the following findings. From 1957 to 1970 David Krutiak had worked for his father's sand and gravel company in North Adams. From 1970 to 1997 he had owned, operated, and greatly expanded the business into general contracting activity (demolition work and construction of roads, pipelines, and buildings) and the excavation and use of sand and gravel throughout northern Berkshire County. The provision of sand and gravel for construction projects comprised about fifty percent of his company's work from 1970 to 1997. Those materials had general utility as bedding for roads, underground pipelines and wire conduits, and buildings. They provided grading, protective insulation, and drainage for structures placed within or above them. The work of his company included removal of the sand and gravel from natural mines, banks, or pits; screening and washing of the materials to fit the specifications of particular jobs; and installation.

The Krutiak company had owned and operated one large pit and two smaller ones in Adams. In 1983, Krutiak and his wife

---

[2]Pursuant to G. L. c. 79, § 14.

Karen purchased the subject twenty-acre parcel in Cheshire as a reserve bank of sand and gravel. In 1985 the town issued the Krutiak company a permit for gravel removal. From 1985 to 1998, Krutiak maintained the permit and withdrew small amounts from the site.

At the public hearing upon his permit application in 1985, Krutiak informed the planning board of Cheshire of his long-term plan to develop building lots on the site. In a written response to an open space survey by the town in 1987, he repeated that intention. His plan became firmer in the mid-1990's. During that period, the operator of a sand and gravel mine on the land immediately north of Krutiak's property sold its tract to a developer. The developer constructed a residential subdivision. The Krutiak company had participated in the construction work of many residential subdivisions. He formed a familiarity with the developer and constructed much of the access road to the subdivision.

Meanwhile, since the early 1980's, the town had remained in violation of standards of the Federal Safe Drinking Water Act (act).[3] The Federal Environmental Protection Agency had rejected the town's requests for exemption and as of 1996 had calculated financial penalties against the town in the sum of approximately $23 million. The town negotiated a far lower penalty and entered an administrative consent order with the agency. The order included an agreement to create a new water supply. In 1996, Cheshire retained an engineering firm to accomplish that objective.

The firm's preliminary study posed three alternative means for compliance with the Federal standards: (1) construction and operation of a filtration system at the existing reservoir; (2) the purchase of water from the neighboring Adams fire district; or (3) the development of a sand and gravel deposit ground well. The engineering analysis concluded (1) that the capital and maintenance requirements of a filtration plant at the existing reservoir would be substantially more costly than the creation of a new groundwater supply; and (2) that the purchase of water from the Adams fire district would be similarly more expensive by reasons of its high wholesale rate and the needed extension of the

---

[3] 42 U.S.C. §§ 300(f) et seq. (2000). The standards of the act and the nature of the violations play no material part in our eminent domain issues.

Cheshire water main by about 10,000 feet to the Adams water source (at a price of approximately $1 million). The town accepted the firm's recommendation to locate its own groundwater well supply.

The engineering firm and a hydrogeology firm conducted a year-long search for an appropriate site. They drilled eight test wells. The first three were bedrock-depth borings in the watershed area of the Kitchen Brook Reservoir. None generated an adequate volume of water for the town's needs; all contained discoloring impurities; and all would have required high transmission costs. The firm then moved the search southeastwardly to the Hoosic River Valley, the locale of an extensive sand and gravel aquifer. After a study of soil mapping information, they sank five test wells on promising sites. The first three generated water of inadequate volume or purity.

The final two test sites produced water of sufficient quantity and quality: the Troy and the Krutiak tracts. Exploration ceased after the Krutiak test boring. Several considerations favored the selection of the Krutiak property. Its well appeared capable of pumping 1,440,000 gallons per day, and the Troy well 560,000 gallons. The town hydrologist attributed "superior hydraulic qualities" to the Krutiak property and regarded it as the "superior" or "most suitable" among the test sites. The engineering firm recommended the Krutiak location to the town. The firm was uncertain whether the soil conditions of the Troy site would sustain the necessary volume through the long term. In the "Environmental Notification Form" required for the construction of a new public groundwater supply well and submitted at the end of the June, 1997, the chairman of the town water commission and the project manager from the engineering firm reported to the Massachusetts Department of Environmental Protection (department), "Five other locations along the Hoosic River Valley were investigated and *only* the proposed well site indicated sufficient capacity and quality for a public supply well" (emphasis supplied). The order of taking issued ten months later.

*Discussion.* 1. *Preliminary procedural issues.* a. *The missing transcript.* After trial the court reporter was unable to locate a cassette tape containing about ninety minutes of testimony offered by the Krutiaks. Part of the lost material consisted of

testimony by Omer Dumais, the project manager and chief engineer from the engineering firm retained by the town; and the remainder consisted of testimony by Stephen Alcott, a professional engineer and an attorney specializing in the financial operations of water utilities and the evaluation of their rates. Pursuant to Mass.R.A.P. 8(c), as amended, 378 Mass. 933 (1979), the trial judge, counsel, and witnesses reconstructed the missing testimony by trial notes, stipulation, and affidavits, so as to leave only one subject of contention: whether Dumais conceded in trial testimony that the Krutiak site qualified as the "unique" location for the town water supply or as only one site among multiple locations atop the Cheshire aquifer capable of serving that purpose.

The trial judge settled the record in accordance with Mass. R.A.P. 8(c) by adoption of several passages of reconstructed testimony in which Dumais acknowledged his engineering assignment to be the location of the "best" or "most suitable" potential site for the new town water supply. The town claims prejudice and seeks a new trial.

We find no prejudice in the reconstruction. It was merely cumulative of other acknowledgments by Dumais in his execution of the Environmental Notification Form to the department and in other testimony fully preserved in the appellate record.[4]

b. *The town's failure to move for a directed verdict and for judgment notwithstanding the verdict.* The Krutiaks argue that the town cannot challenge the sufficiency of the evidence or the accuracy of rulings and instructions upon appeal because it failed to move for a directed verdict at the conclusion of the plaintiffs' evidence, to renew such a motion at the close of all the evidence, and to move for judgment notwithstanding the verdict pursuant to Mass.R.Civ.P. 59(a) and (b), 365 Mass. 827

---

[4]KRUTIAK COUNSEL: "Very quickly, sir, did you realize then that one of the things that [your engineering firm] had to do for the [t]own was to help the [t]own find the best location for a new water supply in the town?"

DUMAIS: "By the time that [preliminary engineering] report was written, there had already been investigations done at various sites and alternatives, so we — yes, we knew that was something we needed to do."

(1974); and that it thereby failed to preserve the sufficiency of the evidence as an appellate issue.

However, the town did mount and maintain a challenge to the sufficiency of the evidence throughout the trial by alternate process. At the outset it submitted a motion in limine asserting that any valuation component derived from water supply rested upon speculation and conjecture unworthy of submission to the jury. During trial it repeated that objection to the opinions offered by the Krutiaks' valuation experts. At the conclusion of the evidence it unsuccessfully requested an instruction excluding any water supply valuation upon the same ground. These efforts consistently informed the judge of its objection to all water-related evidence and preserved the issue for appeal.[5]

2. *The water value component in perspective.* On appeal the town has trained its argument exclusively upon the valuation of the water supply of the taken land. The black letter definition of the fair market value owed as compensation for the taking is the highest price which a willing buyer would pay to a willing seller in an open market in which both were free of any compulsion and in which both were acting prudently with full knowledge of all the reasonable uses of the property. *Epstein* v. *Boston Hous. Authy.,* 317 Mass. 297, 299 (1944). See *Commissioner of Corps. & Taxn.* v. *Worcester County Trust Co.,* 305 Mass. 460, 462 (1940). We measure the fair market value as of the time of the taking. *Kinney* v. *Commonwealth,* 332 Mass. 568, 571-572 (1955). See G. L. c. 79, § 12 (first sentence). "*All* the uses to which the property is reasonably adapted may be considered" (emphasis supplied). *Correia* v. *New Bedford Redev. Authy.,* 375 Mass. 360, 361-362 (1978), quoting from *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.,* 335 Mass. 189, 193 (1956).

At trial the Krutiaks presented evidence and argument in sup-

---

[5]Because the issue of an eminent domain trial is typically a computation of damages rather than a determination of liability, a defendant may be inclined to bypass the usual motions for directed verdict and for judgment notwithstanding the verdict. See, e.g., *YMCA,* 16 Mass. App. Ct. at 667 (the procedural vehicle for the appeal was the judge's denial of the defendant district's motion for a new trial). The wise course would be to keep the trial judge thoroughly apprised by fully reasoned motions in limine, motions for directed verdict, requests for instructions or rulings, and posttrial motions.

port of three complementary applications of the taken property as its combined highest and best use. Their primary expert witness, real estate appraiser Richard Clapp, testified that over the ten years from the taking in April, 1998, the property would have accommodated (1) the extraction of substantial commercial sand and gravel amounts (called "marketable aggregate"); (2) the development of a residential subdivision of six lots; and (3) the generation of a water supply. The uses would proceed sequentially over the decade. The mining of the marketable aggregate above the water table would occupy the first three and one-half years; the creation of the wellhead and water main system would follow; and the subdivision could develop simultaneously with the wellhead or afterward, within the remainder of the tract.

Clapp supported his model by references to a civil engineering study of the probable sand and gravel capacity of the property and to a financial study of the marketable water potential of the site.[6] For each of the three uses he computed a net income stream over the coming decade and discounted it to a value at the time of the taking. By this capitalization of income, he concluded that the fair market value of the Krutiak tract had been $1,032,000 immediately before the partial taking, and $477,000 immediately afterward. He proposed the resulting diminution in value of $555,000 as the Krutiaks' damages. The jury awarded exactly that amount.[7]

Clapp did not precisely apportion the $555,000 between the

---

[6]The participant civil engineers, Charles LaBatt and Vincent Guntlow, and the water finance analyst, Stephen Alcott, testified also in support of their proposals for the property.

[7]The jury rejected two alternative damages figures.

David Krutiak testified as a knowledgeable proprietor of the tract. See, e.g., *Rubin* v. *Arlington*, 327 Mass. 382, 384 (1951); *CBI Partners Ltd. Partnership* v. *Chatham*, 41 Mass. App. Ct. 923, 924-925 (1996), and cases cited (an owner of sufficient familiarity with his land may offer an opinion of its value). He calculated damages of $837,000, comprised of the values of lost marketable aggregate and precluded subdivision development. He did not include any amount for lost water enhancement for lack of knowledge of the subject.

The town's real estate appraiser estimated the damages to be $33,000, or $3,300 per acre for the partial taking. He offered the opinion (1) that a subdivision development on the taken parcel would have been financially prohibitive so as to leave it available for only one single-family residence; (2) that the

three uses. He estimated the water generating value of the property to comprise $150,000 to $175,000 of the total $555,000. Consequently the town's sole focus upon the water-based valuation addresses less than one-third of the amount of the verdict and leaves unchallenged the portion of the award attributable to the extraction of sand and gravel and to the potential development of a residential subdivision.

3. *The particular suitability of the taken land for water generation.* The dominant theme of the town's appeal is that the trial judge did not correctly instruct the jury upon the requirement of the Krutiak site's special suitability for water generation damages and that the evidence did not satisfy that requirement as prescribed in *YMCA, supra* at 675-676. Both contentions are unmeritorious.

The rule confirmed in *YMCA* is that if "the plaintiff's land was particularly well suited for drawing the water, the appropriate measure of that advantage was the difference in cost between drawing the water from the locus and drawing the same water from other suitable tracts." *Id.* at 676.[8] The judge's instruction accurately communicated the point to the jury: "If you find that the property taken was especially well suited as access to water, the appropriate measure of that damage on the subject property is the difference in cost between drawing the water from this property and drawing the same water from other suitable tracts."

Krutiak site possessed no particular superiority over other potential sites above the Cheshire aquifer and therefore lacked any compensable water-bearing advantage; and (3) that the volume of lost marketable aggregate was conjectural for lack of current use and reliable investigation. He concluded that the highest and best uses of the taken acreage would have been one single-family residence and a minor gravel removal operation. He relied upon the sale price of the northward adjoining tract for subdivision development in 1989 for his calculation of a fair market value of approximately $33,000 for the Krutiak taking. He acknowledged that he was not qualified to consider, and had not considered, any valuation of damages for lost extraction of sand and gravel and for lost water generation.

[8]The *YMCA* decision restated the long-standing Massachusetts rule of increased compensation for land enhanced by marketable water capacity. See *Moulton* v. *Newburyport Water Co.*, 137 Mass. 163, 167 (1884) (dictum); *Sargent* v. *Merrimac*, 196 Mass. 171, 174 (1907) ("special adaptability for water supply purposes" may create added value by reason of the "chance" of future use as a water supply); *Lic, Inc.* v. *Hudson*, 10 Mass. App. Ct. 815, 815-816 (1980) (taken land "exceptionally fitted for a municipal water supply" may warrant a heightened fair market value even if it had not served previously as a water source).

The landowners' evidence abundantly satisfied that standard. It showed that the ground well supply on the Krutiak site surpassed the general alternatives of the construction and maintenance of a treatment plant at the Kitchen Brook Reservoir and of the purchase of municipal supply from the Adams fire district. It showed also that the Krutiak well supply provided water in quantity, quality, and cost[9] superior to the water from the three bedrock wells tested near the existing reservoir and from the other four selected sand and gravel sites tested in the Hoosic River Valley. Under cross-examination, the town water commissioner forthrightly acknowledged the special fitness of the Krutiak locus as the new municipal water supply.

> *Q.:* "So is it fair to say, sir, that after all of the Town's efforts in trying to solve its water problems, the only access to a good quality and sufficient quantity of water supply was located on the Krutiak property?"
>
> *A.:* "Of all the sites that we investigated, yes, the Krutiak site was the most favorable."

---

[9]In behalf of the Krutiaks, Stephen Alcott, the water rate analyst, testified that the Troy well site would have resulted in an added cost of $126,000 for connection of water mains to the Cheshire distribution system. In the course of his testimony, Omer Dumais, the town's chief engineering consultant and project manager, acknowledged from examination of the water distribution system "that the Krutiak property was located closer to the [t]own's existing water supply infrastructure relative to the other two sites tested." The jury were entitled to credit Dumais' concession and Alcott's calculation.

In their brief, the Krutiaks assert that the minutes of a meeting of the town water commissioners demonstrate that they estimated that the connection to a competing well site would require 5,500 feet of additional pipeline at an approximate incremental cost of $462,000. However, those minutes refer to the cost differential between the Krutiak and Buda properties (another of the five sand and gravel test wells), not the Krutiak and Troy properties. It is undisputed from the testimony of multiple witnesses that the final candidates for the siting were the Krutiak and Troy sites.

In the end, the evidence left the jury with two sources for measurement of water enhancement damages: the cost differential of $126,000 reported by Alcott; and the capitalized income value of $150,000 to $175,000 submitted by Clapp. They appear to have selected the capitalized income figure. They were entitled to choose the former amount under authority of *YMCA, supra* at 675-676; or the latter amount under authority of *Lic, Inc., supra* at 816, and cases cited.

*Q.:* "That was the only one you found in all of your investigations, right?"

*A.:* "That's true."

*Q.:* "And sir, out of all the places that the Town explored, the Krutiak property site was the most suitable, was it not?"

*A.:* "Yes, it was."

The town's insistence that other equivalent sites must exist above the expansive Cheshire aquifer is misdirected. It did not find them. It did locate the Krutiaks' tract and now enjoys the superior benefit of that site. It must compensate the Krutiaks for that advantage. The standard calls only for the particular suitability of the locus, not its absolute primacy.

4. *The wellhead protection zone.* At trial and on appeal the town has argued that the Krutiaks' tract could not host a public water supply because its area and shape prevented compliance with a water safety requirement of the department. Regulations of that department mandated that the proprietor of a wellhead producing 100,000 gallons or more per day for public consumption must maintain a protective radius of 400 feet so as to prevent the introduction within that range of any structure or use dangerous to the purity of the water. 310 Code Mass. Regs. §§ 22.02, 22.21(1)(c) (1997). In effect the well operator must own or control the circle of land determined by the 400-foot radius. After acquisition of parcel two of the Krutiaks' tract, the town had taken two small slices of abutting properties (a fraction of an acre each) so as to satisfy the 400-foot requirement. The town introduced into evidence portions of the pertinent regulations. It has maintained that they do not allow for variance or exemption. In fact the regulations do permit appropriate variances.[10] However

---

[10]In pertinent part, 310 Code Mass. Regs. § 22.21(3)(b) (1997) provides as follows (emphasis supplied): "Current and future land uses within the [radius] shall be limited to those land uses directly related to the provision of the public water system *or to other land uses which the public water system has demonstrated have no significant impact on water quality. The [d]epartment*

neither the town nor the Krutiaks offered them in evidence. The jury did not learn of them.

Instead the Krutiaks offered evidence that they could satisfy the 400-foot requirement by an appropriate placement of the well in the tract at a point other than the site chosen by the town on parcel two. Both David Krutiak and Stephen Alcott offered testimony to that effect. Alcott testified more extensively in support of the probability of a favorable waiver by the department for a Krutiak well. He cited three examples of apparent waivers. The town's consulting engineer acknowledged that the department did grant exemptions for "benign" uses within the protective zone.

For the valuation of the highest and best use of taken land, the law does permit the fact finder to consider a potential use restricted at the time of the taking if the evidence supports a reasonable prospect of the removal of the restriction. See especially *Douglas Envtl. Assocs.* v. *Department of Envtl. Protection*, 429 Mass. 71, 76 (1999) ("[T]he fact that a potential use is prohibited or restricted by law at the time of the taking does not preclude its consideration if there was a reasonable prospect of rezoning or acquiring a special permit").[11]

The trial judge correctly instructed the jury.[12] They could have found that the Krutiaks enjoyed a reasonable prospect of a waiver or variance from the 400-foot requirement and that a

---

*may require greater distances or permit lesser distances* than the [400-foot] distance set forth at 310 [Code Mass. Regs. §] 22.02, if the [d]epartment deems such action necessary or sufficient to protect public health."

[11]See, e.g., *Lee* v. *Commonwealth*, 361 Mass. 864, 865 (1972); *D'Annolfo* v. *Stoneham Hous. Authy.*, 375 Mass. 650, 656-657 (1978) (valuation can rest upon evidence that a willing buyer would take into account the "possibility" of a change in zoning); *Colonial Acres, Inc.* v. *North Reading*, 3 Mass. App. Ct. 384, 386-387 (1975) (a landowner may show a reasonable probability of removal of a zoning restriction as a factor of fair market value at the time of taking).

[12]The judge's charge was clear: "However, if there is a reasonable prospect that a use prohibited at the time of the taking would soon be allowed — that is, that the prohibition would be lifted — then that use may be considered in assessing fair market value. However, there must be a reasonable prospect that the use would be allowed."

willing buyer would have included that prospect as an element of fair market value.

5. *Consideration of the contemplated public use.* An owner is not entitled to an increase of fair market value resulting from the public use or improvement contemplated by the taking authority. Nor may the announcement of public purpose increase the fair market value for calculation of the landowner's damages. See *Cole* v. *Boston Edison Co.*, 338 Mass. 661, 665-666 (1959); *Lipinski* v. *Lynn Redev. Authy.*, 355 Mass. 550, 554 (1969); *Roach* v. *Newton Redev. Authy.*, 381 Mass. 135, 137 (1980). The danger of such a bootstrapping valuation may be greater in circumstances in which the property owner is hypothesizing as a new highest and best use the very activity for which the government is taking the land. That situation has arisen here. The Krutiaks seek a measure of compensation for the operation of their property as a water supply, a use to which they had not put it but to which the town will put it for the first time. The town complains that the judge's instruction did not adequately safeguard against the danger of valuation inflated by the public purpose of the taking.

The judge gave the correct instruction: "Now, the owner is not entitled to recover for any increase or decrease in the value of the property taken that is produced by the public improvement project for which the property was taken or by the early announcement of that project." He rejected alternate language from the town. The trial judge is free to choose his or her own specific language so long as it accurately communicates the substance of the governing law, see, e.g., *Jacobs* v. *Pine Manor College*, 399 Mass. 411, 414 (1987), especially if the judge fears confusion from alternate language, *Liebovich* v. *Antonellis*, 410 Mass. 568, 575 (1991). The jury is presumed to have followed the instruction. *Roberts* v. *Southwick*, 415 Mass. 465, 473 (1993).[13]

---

[13]The situation in which a municipality is taking previously untapped land for its public water supply does not violate the prohibition against anticipatory valuation. The land need not have generated marketable water in the past and the municipality itself may constitute the entire market. See *Lic, Inc., supra* at 816, and cases cited. The properly supported hypothesis of a profitable private water company may still serve as a highest and best use. In this instance, as we have seen, it is a component of the highest and best use.

*Conclusion.*[14] The trial judge properly ruled upon the controlling law and correctly instructed the jury. The evidence supported the damages verdict.

*Judgment affirmed.*

---

[14]We have considered the Krutiaks' request for an award of double costs and attorney's fees. Although the town's arguments lacked merit and sometimes accuracy, they do not warrant the requested sanctions.