DECISION
This eminent domain matter is before the Court on a petition filed by Davol Square Jewelry Mart, LLC (Davol) and Davol Square Jewelry Mart Corporation, Inc. (collectively, the petitioners), for an assessment of damages resulting from Narragansett Bay Commission's (NBC) acquisition of temporary and permanent easements over certain property located in Providence, Rhode Island. NBC acquired those easements to facilitate the development of a Combined Sewer Overflow Abatement Program. The petitioners contend that NBC has not provided just compensation for the taking of these easements. Following a six-day, nonjury trial before the Court between October 17, 2007, and October 24, 2007, NBC renewed its Motion for Judgment on Partial Findings pursuant to Rule 52(c) of the Superior Court Rules of Civil Procedure. A ruling on the motions is herein incorporated with a decision on the merits. Jurisdiction is pursuant to G.L. 1956 § 37-6-18. *Page 2 
 I Facts and Travel
The parties filed a joint stipulation of facts, which in part, is summarized below. Davol is a limited liability company with Davol Square Jewelry Mart Corporation, Inc., as its managing member. Davol is the owner of property located at 69 Point Street in Providence (the property or the Davol property). The property is comprised of approximately 3.04 acres, or about 132,720 sq.ft., and is located to the northeast of the intersection of Eddy and Point Streets. It formally is known as Assessor's Plat 21, Lot 310, and is bordered on the east by the Providence River. The property itself commonly is referred to as "Davol Square," and is found in the City's Jewelry District.[1]
Two buildings currently occupy Davol Square: the first is known as the Davol Building, located on the western side of the property near Eddy Street, and the second is called the Maguire Building. The Davol Building is comprised of approximately 109,000 square feet of rentable office space. The Maguire building was sold by the Davol Building's owners, and now rests on its own subdivided parcel of land, Plat 21, Lot 407. These buildings are sometimes called the "Davol Complex." A third structure, the Goff Building, once stood on the eastern edge of the property, near Point Street and the water.[2] A parking lot is located on the eastern portion of the property. In addition, above-ground, high-power transmission lines appear along the entire eastern border of the property. A grassy area owned by the Narragansett Electric *Page 3 
Company (NEC), which currently serves as a park, also separates the property from the river. South Street is immediately north of, and adjacent to, the northern boundary of the property.
Davol Square is located in the D-2 zoning district, and is subject to a maximum building height restriction of ninety feet, or seven stories, absent zoning relief. In the D-2 zone, one parking space is required for each 1000 square feet of leased office space, and 0.75 spaces are required for each residential dwelling unit. The property sits within 200 feet of the Providence River and, therefore, any construction on the property would require approval from the Rhode Island Coastal Resources Management Council (CRMC). The Davol property is located within an A1 flood hazard area. It also falls within the Industrial and Commercial Historic Overlay Zoning District; the demolition of any building in that district requires Providence Historic District Commission (PHDC) approval. The PHDC has published a series of Design Guidelines governing such applications.
In 2005, the property was subdivided into four lots. Three of the subdivided lots — parcels 2, 3, and 4 — subsequently were conveyed to River House, LLC, by deed dated December 28, 2006.[3] However, a condition was attached to the subdivision, resulting in a parking lien applicable to the entire subdivided property. The lien requires that 149 parking spaces be maintained for the benefit of the buildings on the Davol property — namely, the Maguire and Davol buildings. At that time, 225 spaces were available on the property. An easement for 40 parking spaces on the Davol property runs in favor of the Maguire Building.
Pursuant to a 1992 consent agreement with the Rhode Island Department of Environmental Management, NBC was required to develop a Combined Sewer Overflow Abatement Program. This entailed the construction of a facility and infrastructure to control the *Page 4 
flow of materials into Narragansett Bay. To complete this project, NBC had to acquire easements over portions of the property. It made known its plans to condemn the property in September 2001.
Beginning on April 4, 2003, NBC acquired a permanent easement over the property for public sewer purposes. This permanent easement is a strip of land situated along the northeast and eastern boundaries of the property spanning approximately 7080 square feet in area. Specifically, a portion of the permanent easement rests along the eastern boundary of the property, parallel to the power lines on the side of the property bounded by the river; the other portion of the permanent easement runs parallel to South Street. The rights of Davol to use, construct over, make or install any improvement, or build a structure over the permanent easement are governed by the recorded permanent easement.[4]
On the same date, NBC also acquired a temporary easement occupying approximately 19,326 sq.ft. of space on the property. The temporary easement area was fenced off for construction on April 22, 2003. The construction site was plagued by noise, dust, excavation, and heavy machinery. NBC's rights with respect to the temporary easement were terminated on August 18, 2004, approximately sixteen and one-half months after its recordation.[5] During this time, NBC leased a 30,000 square-foot parcel to provide a satellite parking lot in order to replace the parking spaces that had been displaced by the temporary easement.
In October 2001, NBC consulted with Thomas Andolfo, an appraiser, regarding the proposed easements. Pursuant to G.L. 1956 § 37-6-17, NBC paid Davol a total of $264,690 for *Page 5 
the takings; specifically, it compensated Davol in the amount of $106,200 for acquiring the permanent easement, and $158,490 for acquiring the temporary easement space.[6] Of the latter figure, $73,440 was paid to provide a parking attendant for the satellite parking lot that NBC had provided to alleviate parking problems. The satellite lot was located approximately 500 feet north of the Davol property, and took approximately three to seven minutes to reach by foot. The satellite lot was striped, paved, lit, and provided 105 parking spaces with card access.
In May of 2005, Davol contacted the firm of CB Richard Ellis (CBRE) to perform a retroactive appraisal of the property. Mr. Webster Collins (Mr. Collins), an Executive Vice President and Partner of CBRE, led this project. The firm previously had provided management and leasing services to Davol, and between 2001 and 2004, had served as its exclusive leasing agent. Based on CBRE's appraisal, Davol contends that the sum it received from NBC did not represent just compensation for the acquisition of the temporary and permanent easements. As discussedinfra, Davol seeks compensation in the amount of $1,416,310, plus interest from the date of the taking. This figure represents the appraisal amount of $1,681,000, less the compensation already paid to it by NBC.
While the nonjury trial of this eminent domain matter was conducted before the Court over six days in October 2007, this is not the first decision the Court has produced with respect to this matter. On June 14, 2007, the Court issued a decision on a motion in limine brought by NBC. There, the Court considered whether Mr. Collins, Davol's expert appraiser, could offer testimony on pre-taking lost profits incurred by Davol, as well as testimony concerning the highest and best use of the property. The Court concluded that the evidence of losses occurring *Page 6 
during the pre-taking period were not relevant to the compensation due Davol; therefore, pre-taking losses would not be admissible at trial. Additionally, the Court ruled that Mr. Collins would be permitted to testify regarding his estimate of Davol's highest and best use in light of the reasonable probability of zoning changes which might be established through his testimony.[7]
On September 11, 2007, this Court issued another Decision to clarify the boundaries of Mr. Collins' proposed testimony relating to alleged lost rents associated with NBC's taking of Davol's property. The Court agreed to permit the parties to introduce evidence regarding the alleged lost rental income incurred from the date of the enactment of the temporary taking on April 4, 2003, but restated that losses occurring prior to the taking date were not relevant to the Court's assessment of just compensation.[8]
At trial, the Court heard from numerous witnesses. Davol presented two: Richard Jaffe, Executive Vice President of Davol Square Jewelry Mart Corporation, Inc., and Mr. Collins, Davol's expert real estate appraiser. NBC produced five witnesses: Mr. Thomas Brueckner (Mr. Brueckner), an engineer; Mr. Thomas Andolfo (Mr. Andolfo), an expert in real estate appraisal; Mr. David Tidwell (Mr. Tidwell), an architect; Mr. Jay Fluck (Mr. Fluck), an Executive Vice President of CBRE; and Mr. Scott Bamford (Mr. Bamford), an engineer whose subspecialty is in geo-technical engineering matters. The substance of their testimony will be addressed when appropriate. *Page 7 
 II Standards of Review A Respondent's Motion for Judgment on Partial Findings
Rule 52(c) instructs the court, during or after a nonjury trial, to "enter judgment as a matter of law . . . with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue. . . ." In rendering such a judgment, the trial justice "need not engage in extensive analysis and discussion of all the evidence. Even brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case." Donnelly v. Cowsill, 716 A.2d 742, 747
(R.I. 1998) (quoting Anderson v. Town of E. Greenwich, 460 A.2d 420, 423
(R.I. 1983)). When considering a Rule 52(c) motion, the trial justice must weigh "the credibility of witnesses and determine[] the weight of the evidence presented. . . ." Broadley v. State, 939 A.2d 1016, 1020
(R.I. 2008) (quoting Pillar Property Mgmt., L.L.C. v. Caste's Inc.,714 A.2d 619, 620 (R.I. 1998) (mem.)). Additionally, in evaluating a motion for judgment as a matter of law in conjunction with a nonjury trial, the trial justice need not view the evidence in the light most favorable to the nonmoving party. Id. at 1020.
 B Nonjury Trial Standard of Review
It is axiomatic that Davol has the burden of satisfying the Court by a preponderance of the evidence as to all of the claims. In this condemnation matter, "the trial justice sits as the trier of facts as well as of law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, [s]he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences."Id. The factual determinations and credibility assessments made by a trial *Page 8 
justice "traditionally . . . [are accorded] a great deal of respect."In re Dissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975
(R.I. 2006).
Thus, after reviewing the evidence, the trial justice must "find the facts specifically and state separately its conclusions of law thereon." Super. R. Civ. P. 52(a). "Even brief findings will suffice as long as they address and resolve the controlling factual and legal issues."White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983) (citing J.W.A. Realty,Inc. v. City of Cranston, 121 R.I. 374, 384, 399 A.2d 479, 484-85
(1979)).
 III Analysis
NBC contends that Davol has received almost all of the compensation it was due as a result of NBC's acquisition of a temporary and a permanent easement over its property. Davol, however, contends that the fair market value of its property at the time of the acquisition was $1,681,000, [9] based on its highest and best use as a fourteen-story luxury-condominium complex.[10] Alternatively, Davol asserts that without zoning approvals, the property's highest and best use as of right would be a seven-story luxury-condominium complex producing a fair market value of $1,039,000. The evidence of this valuation was offered through the opinion testimony of Mr. Collins, a recognized expert in real estate valuation.
While presenting its case, NBC offered the testimony of Mr. Andolfo, also a recognized expert in real estate appraisal. Mr. Andolfo acknowledged that Davol suffered damages as a result of the temporary and permanent easements acquired by NBC; however, he concluded that the just compensation due Davol was $280,500, of which Davol already has received $264,690. *Page 9 
Article I, section 16, of the Rhode Island Constitution provides that "[p]rivate property shall not be taken for public uses, without just compensation." It is well-settled that the measure of just compensation to which a landowner is entitled upon condemnation proceedings is the fair market value of the property as of the date of the taking.See Ocean Road Partners v. State, 612 A.2d 1107, 1110 (R.I. 1992);O'Donnell v. State, 117 R.I. 660, 665, 370 A.2d 233, 236 (1977). The best evidence of a property's fair market value is the amount paid for substantially similar and comparable properties on the open market around that time. See J.W.A. Realty, 121 R.I. at 380, 399 A.2d at 482. Adjustments may be made for minor differences between the properties utilized for comparison and the subject real estate. See Serzan v.Director of the Dep't of Envt'l Mgmt., 692 A.2d 671, 675 (R.I. 1997). "Significant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put." Warwick Musical Theater, Inc. v.State, 525 A.2d 905, 910 (R.I. 1987). A valid comparable sale must be ". . . of substantially the same type of property as that being condemned, and located in the same general area." 7 Nichols on EminentDomain § G4.03[5][b] (3d rev. ed. Julius L. Sackman 2007). While the comparable-sales method is the preferred valuation device, the trial justice may depart from this method when employing this method would be inappropriate, as evidenced by expert testimony. See Warwick MusicalTheater, 525 A.2d at 910.
An expert appraising the value of condemned land may consider all uses to which land is, or might, reasonably be put. See Sweet v. Murphy,473 A.2d 758, 761 (R.I. 1984). The compensation recommended, however, should be based on the most advantageous and valuable use of the property, sometimes referred to as its "highest and best use." See Ocean RoadPartners, 612 A.2d 1107. A property's highest and best use must be physically possible, *Page 10 
appropriately supported, financially feasible, and result in the highest land value. See 7 Nichols on Eminent Domain at § G4.03[6][b]. Consequently, the sum assessed to the owner neither depends on the use to which the land has been put, Conti v. R.I. Economic Dev't Corp.,900 A.2d 1221, 1239 (R.I. 2006), nor concrete plans for its development.See Nat'l R.R. Passenger Corp. v. Certain Temporary Easements,357 F.3d 36, 40 (1st Cir. 2004). Rather, its suitability for other uses must be considered. See Conti., 900 A.2d at 1239.
While there is a presumption in favor of designating a property's existing use as its highest and best use, 26 Am. Jur. 2d § 297 (citingOlson v. U.S., 292 U.S. 246 (1934); U.S. v. Land, 62.50 Acres of LandMore or Less, Situated in Jefferson Parish, State of La., 953 F.2d 886
(5th Cir. 1992)), this presumption may be overcome if the owner can demonstrate that the property is "adaptable and needed or likely to be needed in the reasonably near future" and "that the prospect of demand for such use affects the market value while the property is privately held." Olson, 292 U.S. at 255. The highest and best use of a property must be proven by a preponderance of the evidence. See U.S. v. 3.0 Acresof Land, more or less, 378 F. Supp. 30, 33 (D.C.Va. 1974) (recognizing that highest and best use must be demonstrated by a preponderance of the evidence); Florida Gas Transmission Co. v. Dupont, 264 So.2d 708, 710
(La.App., 1972) (same); City of Jackson v. May, 193 So.2d 555, 556-57
(Miss. 1967) (same). Furthermore, a trial justice retains the authority to determine the credibility of each expert's evidence, and to decide whether to accept or reject a proffered valuation. See Sun-LitePartnership v. Town of West Warwick, 838 A.2d 45, 48 (R.I. 2003).
The Court, sitting without a jury, heard testimony and received evidence on the issue of the highest and best use of the Davol property, as well as its fair market value. The evidence *Page 11 
before the Court regarding the property's fair market value at the date of condemnation largely results from the testimony of dueling appraisers.
Apart from the value of the takings, the facts involving the acquisition of both easements are not generally in dispute. However, the parties disagree about whether the Court should consider Davol's claim that the highest and best use of the property is a fourteen-story condominium complex containing 134 units which, if built, would exceed the height restrictions set forth in the ordinance, and would require certain regulatory approvals. Mr. Collins also adds that a 419-car parking garage would be necessary to support the complex. Consequently, before addressing the valuation of the subject property, the Court must resolve the issue regarding the probability of obtaining zoning relief on the Davol property.
 A Probability of a Favorable Zoning Change
Inherent in Mr. Collins' appraisal is the assumption that a variance would be issued to allow a dimensional deviation with respect to building height of a proposed structure on the Davol property. Specifically, Mr. Collins proffered that it was reasonably probable that Davol would receive permission to construct a building which would stretch well beyond, in fact double, the maximum designated height for a structure in the D-2 zone. NBC, however, avers that Davol's reliance on Mr. Collins' prediction is misplaced.
The Court observes that any claimed highest and best use must be consistent with existing land-use regulations, and that compensation will not be awarded for an unlawful use. See id.; See also Ocean RoadPartners, 690 A.2d at, 250; Palazzi v. State, 113 R.I. 218, 223,319 A.2d 658, 661-62 (1974). "[Z]oning restrictions on the use of land which arise out of a zoning ordinance generally are admissible in order to assist the [C]ourt in making a determination of the fair market value."See id at 222-23, 319 A.2d at 661; See also Hunt v. Director of Pub.Works, *Page 12 99 R.I. 111, 206 A.2d 91 (1965). This is because the probability of a favorable zoning change would impact the fair market value of the land with respect to the price a willing buyer would pay for it.See Krutiak v. Town of Cheshire, 882 N.E.2d 370, 379 (Mass.App.Ct. 2008) (noting reasonable prospect of removal of zoning restriction is factor in fair market value).
Just as a landowner assumes the burden of demonstrating the fair market value of its property at the time of the taking, Nasco, Inc. v.Director of Pub. Works, 360 A.2d 871, 876 (R.I. 1976), it also bears the burden of proving that a reasonable probability of a favorable change in a zoning classification exists. Arlen Rathkopf, The Law of Zoning Planning § 75:8; See also Ocean Road Partners, 670 A.2d at 250 (requiring claimant to present evidence sufficient to establish reasonable probability that use will be made allowable in near future). "[M]ere testimonial conjecture that, in the future, use restrictions may be lessened by rezoning is inadmissible on the question of fair market value." Palazzi, 113 R.I. at 223, 319 A.2d at 661 (citations omitted).
 Wishful thinking, optimistic conjecture, speculation, rumor and unfounded prognostications do not furnish a proper basis for a finding that a litigant has proved the reasonable probability of a future change in zone. Because of the uncertainties necessarily attending the determination of the probability of the happening of such an event in the future, claims and evidence regarding the probability must be scrutinized with care and examined with caution. Nevertheless, if such a reasonable probability is proved, it is a proper fact to be considered in the determination of the fair value of property taken by condemnation proceedings. See Budney v. Ives, 239 A.2d 482, 484 (Conn. 1968).
This general rule also has been expanded to include the reasonable possibility of obtaining a variance. See 4 Nichols on EminentDomain § 12C.03[2] (3d rev. ed. Patrick J. Rohan and Melvin A. Reskin 2004). Therefore, uncontradicted and unimpeached evidence must tend to establish that lowering the use restrictions of a particular parcel reasonably could have been *Page 13 
available at the time of the taking. See Palazzi, 113 R.I. at 225,319 A.2d at 663 (discussing requirements of Hunt v. Director of Pub.Works, 99 R.I. 111, 206 A.2d 91 (1965)); See also Rathkopf § 75:2 (considering evidence of reasonable probability of grant of special exception or variance an element of value in the property).
The Court finds unconvincing Davol's assertion that a height variance would be granted to construct a fourteen-story building in a D-2 zone. In his November 1, 2006 Supplemental Report, Mr. Collins concluded that the Providence market was strengthening as of the date of the taking, and based on the trends and history of zoning relief, market activity, and discussions with public officials, he found that a height twice the height of the existing D-2 zoning restriction would be reasonable. While Mr. Collins used variances issued to two properties, 121 South Main Street, and 198-200 Dyer Street, as examples to support his opinion regarding the reasonable probability of obtaining a height variance for the Davol property, the Court does not find his reliance on these variances sufficient to establish a trend of relaxed height restrictions in the D-2 zone.
"Although the granting of an isolated variance, in the exercise of discretion, has little or no probative force, the granting of many variances is considered evidence of a continuing trend that will render . . . [a zoning change] inevitable." See 4 Nichols on EminentDomain at § 12C.03[3]. The owners of 121 South Main Street received a variance to construct a structure two and three-quarters greater than the size allowed by zoning in 1984. This deviation not only occurred nearly twenty years ago, but also was issued prior to the enactment of an ordinance provision which prohibits variances exceeding twenty-five percent of the maximum allowable *Page 14 
building height. See Providence Zoning Ordinance § 420.4.[11] Further, the South Main Street property is located within a different zone and is categorized as a C-2 property.
With respect to the Dyer Street property, the record is devoid of any indicia that a variance actually had been issued to allow the construction of a building which exceeded the maximum height set forth in the ordinance. In addition, the record does not indicate that any height variances ever have been granted in the D-2 zone.[12]
Accordingly, the Court cannot conclude, based on the single variance granted to a nearby property owner, that it was reasonably probable that the Davol property would receive such relief.[13] Further, during his trial testimony, Mr. Collins conceded that a variance was not expected in the near future, and that he was not aware of any height variances issued within the City between 2003 and 2006.[14] *Page 15 
Additionally, Davol has not demonstrated that certain approvals, as required from agencies other than the zoning board, would be reasonably forthcoming. See Uniform Appraisal Standards at 17 (stating probability of obtaining governmental approvals necessary for highest and best use analysis); See also G.L. 1956 § 46-23-1 et seq. (outlining Coastal Resource Management Counsel's jurisdiction over land regulation near coastal waters); Providence Zoning Ordinance § 501.3 (authorizing Historic District Commission to regulate development in historic districts and develop standards and guidelines for that purpose). In fact, Mr. Collins' report did not even indicate that the property was subject to CRMC and PHDC regulations; the latter actually seeks to avoid great variation in building heights with respect to the existing surrounding structures. See PHDC Design Guidelines for the Jewelry Historic District at 17; See also 4 Nichols on Eminent Domain at § 12C.03[2] (considering reasonable probability of permits issued by an agency a factor in valuation). Consequently, Mr. Collins' testimony that local and state agency approvals probably would be issued to allow for construction of a fourteen-story building at some future time was speculative at best.
Consequently, the Court concludes that Davol did not present sufficient evidence to demonstrate that this proposed use was both reasonably probable and legally permissible. As such, it cannot accept Davol's assertion that the highest and best use of the property is a fourteen-story condominium complex. Indeed, the highest and best use of the property cannot be any type of fourteen-story building. Since Davol's claim that a fourteen-story luxury-condominium complex is the highest and best use of the property cannot be maintained under controlling law, NBC's motion for judgment as a matter of law with respect to this issue is granted. See Super. R. Civ. P. 52(c). Based on the foregoing, the Court must evaluate the Davol *Page 16 
property in light of the existing restrictions on this particular property. Ocean Road Partners, 612 A.2d at 1110.
 B The Battle of the Experts
The Court next will address the proper valuation for the condemned property. As alluded to, supra, the key testimony for Davol was offered by Mr. Collins. Mr. Andolfo, having significant experience evaluating properties in the Jewelry District, testified on behalf of NBC. The Court will discuss their conclusions seriatim.
 1 The Petitioners' Appraiser
While performing his highest and best use analysis of the property, Mr. Collins determined that two markets existed in the neighborhood: a residential market and an office rental market. He predicted that the residential market around the property would grow between 2005 and 2010; specifically, Mr. Collins projected a growth of fifteen households-per-year during that period. He indicated that a 36% increase in Providence residential sales occurred between 1999 and 2004. The appraiser named nine properties which were either under construction, or would be constructed, and that all of these properties would include, at least in part, condominium development. Mr. Collins stated in his report that,
 [d]espite these pockets of new construction, the prospects of new condominium ownership derived from empty nesters, first time buyers or potential upgrades, as well as, the likely return of employment growth particularly in the financial services sector should drive future demand. The 134-unit waterfront condominium component planned for [the property] should outperform the overall market and attract buyers from other high-end luxury condominiums that are either somewhat dated or have not been well received by the market. See Collins' Report at 39. *Page 17 
Mr. Collins also performed an office-market analysis when preparing his report. He observed that office vacancies in the Jewelry District had decreased from 28.09% in 2001 to 6.88% in 2004, and that this turn around has been deemed the strongest vacancy recovery in Providence.See Collins' Report at 39 (commenting Davol property represents 17% of the market and is subject to leasing activity resulting in Jewelry District market turn). This fact is not surprising, as the parties have stipulated to the following:
 Davol's IRS Partnership Returns report gross rents as follows: 2001 — $916,922; 2002 — $1,448,853; 2003 — $1,500,102; and 2004 — $2,306,554. The net operating income of Davol before interest and depreciation for year 2002 was $424,080; for year 2003 was $423,975; and for year 2004 was $948,269. Stipulated Facts, ¶¶ 39-40.
In addition, the parties acknowledge that 34.4% of the Davol Building's space was leased as of June 2001, 57.5% leased as of June 2002, 60% leased as of June 2003, and fully occupied as of May 2004.[15]See id. at ¶ 41.
`Mr. Collins described the property as "Class B" office property, with typical rents ranging from $14 to the low $20's per-square-foot per year. He concluded that, "[o]verall, the subject property represents a good Class B, office complex in an emerging location[,]" and
 [b]ased on the information presented above, the subject's submarket is in good overall condition. Steady market improvement is expected over the next few years. Office vacancies are expected to remain low with a gradual increase in rent due to limits on major increase in supply. The subject's position within the submarket leads us to believe that it will fare well along with the mid-range of the Class B office market. See Collins' Report at 43. *Page 18 
Mr. Collins described the total land area as 132,452 square feet, with approximately half of that space devoted to the building, and the balance in use for parking. Upon concluding that strong condominium activity was in place, and viewing land sales that are now condominium/mixed-use developments, but had occurred prior to the taking, he determined that the highest and best use of the vacant property that is encumbered by the easement would be a mixed-use and residential condominium development. Mr. Collins stated that given the physical attributes of the site, the property could support various legally permitted uses per its D-2 zoning classification. He then commented that residential use would represent the most financially feasible option for the site. In addition, he observed that although the maximum profitability of the site was beyond the scope of his assignment, it should be consistent with neighborhood trends and existing land uses. See Collins' Report at 56. Based on this analysis, Mr. Collins concluded that the highest and best use of the property was a luxury condominium complex.
Mr. Collins made it clear that he was valuing the property based on the size of the permanent easement only — 7080 square feet of area. He cited [to] the Uniform Appraisal Standards for Federal LandAcquisitions, an authoritative text in his field, to support his valuation of only the land burdened by the permanent easement. Mr. Collins explained that a single physical tract of land may be comprised of multiple parcels having multiple uses. In this case, he argued that the current parking area, over which the permanent easement lies, can support a use independent of that of the Davol Building. Mr. Collins called the relevant parking area "the development parcel," and cited its size as approximately 49,000 square feet. He then observed that the permanent easement now sits atop approximately 14% — or 7080 square feet — of that space. However, he concluded that the total developable area lost was 49,560 *Page 19 
square-feet — seven times the square footage of the permanent easement, because seven stories would be built. RGB, an architectural firm engaged by Davol, drafted plans that depicted as much.
Two diagrams of a multi-unit use appeared within Mr. Collins' report.See id. at 57-58. Mr. Collins asserted that the diagrams were designed to depict the site as though the permanent easement had not been acquired. Mr. Kip McMahan at RGB drafted these "preliminary plans," and the 7080 square-foot ground-floor of the building appeared therein. Mr. Collins stated that the other plans in RGB's report, however, included multi-level parking, with residential areas resting above those levels.Id. at 337. The structure, as depicted in RGB's schematic, consumed the entire parking area, including the area once occupied by the Goff Building. Mr. Collins stated, however, that the Goff building still was in existence at the time of the permanent taking, and that there was no reason to believe that it would have been demolished as of the date the drawing was designed.
Mr. Collins determined that the property, after the taking, suffered no severance damages. Plainly put, Mr. Collins concluded that the taking of the permanent easement did not impair the value of the remainder, which included the Davol Building. In addition, he asserted that although the parking lot was the current highest and best use of the property, such use likely was going to change in the relatively near future. See Appraisal Institute, The Appraisal of Real Estate at 323-24 (12th ed.). Therefore, he valued the permanent easement area alone — as a separately developable parcel — when calculating its fair market value. (Tr. 363-64.)
After concluding that the property's highest and best use was a luxury condominium complex, Mr. Collins utilized the sales comparison approach to estimate the fair market value of the property. His assessment of the value of the Davol property was based on twelve comparable sales. The first five sales occurred during a market expansion between 1987 and 1990; no sales *Page 20 
occurred between 1991 and 1995; and the remaining seven took place between October 1996 and October 2005, a time which Mr. Collins designated as a market recovery and start of expansion period. In large part, however, Mr. Collins relied on three comparable sales in assessing the property's value: sale eight, the Mariott Hotel on Memorial Boulevard in November 1998; sale twelve, Jefferson at Providence Place, which is located on the Route 95 side of the Providence Place Mall, in October 2005; and sale eleven, the 198-200 Dyer Street property, in October 2005. He valued these properties according to their FAR value, or floor to area ratio, which reflects the total developable space because increased height and buildable area increases value.[16] Mr. Collins also described the FAR value of land as "the price per number of square feet that you can put on the land, [or] price per buildable foot." (Tr. at 152.)
Mr. Collins described the Jefferson property as a 205,684 square-foot parcel of land that was sold and later used for the construction of a structure containing 330 apartment units. The deal included a simultaneous sale of existing multi-family housing units for condominium conversion. The sale price was $16 million, and the negotiations took place around the time of NBC's acquisition of Davol's property. While he did not adjust the price for the location, he did adjust the price by 40% to reflect conditions of sale and market conditions, thereby arriving at a $30.50 per square foot final figure.
Next, Mr. Collins performed an adjustment on the Memorial Boulevard site. It is located next to Union Station and was purchased for construction of a new 216-room, 6-story Courtyard by Marriot. It was sold in 1998 for $5.05 million, or $74.32 per square foot. The FAR value was calculated to be $29.50 per square foot, which Mr. Collins adjusted upward 25% for market conditions, and then downward 30% for its "key" Memorial Boulevard/Dorrance location, a site *Page 21 
that he conceded was better than the Davol property. He then arrived at a final FAR value of $25.81 per square foot.
Mr. Collins relied most heavily on comparable sale eleven, the 198 Dyer Street property. Mr. Collins described 198 Dyer as a property purchased "for development," even though at the time of its sale, it was in a D-1 zone and was subject to a 45-foot height restriction. A two-year due-diligence process was completed before its purchase to determine 198 Dyer's development potential. The sale closed for $11 million in October 2005. Mr. Collins stated that the site contained 92,120 square feet along the Providence River, and was improved with a 37,344 square foot office building — which later was demolished at a cost of $300,000. He stated that site is a "long arrow shot" from the Davol property. Mr. Collins calculated the adjusted sale price to be $122.67 per square foot, and upon investigating the sale with the buyer, concluded that the price per FAR was $25.68. He made no adjustments with respect to conditions of sale, market conditions, or other conditions relating to the location or physical characteristics of the property.
Mr. Collins used the Dyer Street property to estimate the value of the Davol site. After interviewing the developer, he assessed the FAR basis value at $25 per square foot. He then multiplied this value by the total area per floor — 7080 square feet — and the total number of developable stories — seven — to arrive at a land-value calculation of $1,239,000 "before" the taking. He next calculated the after-taking value of this sliver parcel to be $200,000.[17] Mr. Collins then concluded that because the walkway and driveway entrances to the permanent *Page 22 
easement were the only rights that Davol retained in the property, the difference between the "before" and "after" values was $ 1,039,000 million.
With respect to the temporary easement, Mr. Collins utilized the "income approach" valuation method. He estimated that parking spaces occupied by the temporary taking had a pre-taking rental value of $125 per month per space.[18] Mr. Collins calculated the monthly income per space at the satellite lot at $50. He then subtracted that amount from the pre-taking rental value of $125 to conclude that the lost rent per space was $75 per month. Mr. Collins then multiplied the $75 per month rental loss by the number of spaces displaced (105) by the time period that the site was occupied by the temporary easement (1.375 years). He discounted this total by 5% to reflect vacancy and operation expenses per square foot to reach a total taking value for the temporary easement of $106,000.
 2 The Respondent's Appraiser
Mr. Andolfo's valuation stands in stark contrast to that prepared by Mr. Collins. Mr. Andolfo first assessed the property's highest and best use as if the site was vacant. He determined that although the size of the property was large for the Jewelry District, it also was irregularly shaped. Mr. Andolfo stated that the soil grade would support many varied types of urban/community development. He noted that legally-permitted uses for the property ranged from residential to commercial to industrial.
Mr. Andolfo observed that industrial uses in the Jewelry District have shrunk, and many of those uses have been converted to residential, retail, or professional office development. Given these factors, Mr. Andolfo determined that the Davol property would be well-suited for *Page 23 
general commercial use as a mixed-use development. Such a use could include office, retail or residential components. The development would be a "Class B" type and rates would be commensurate with other locations in the Jewelry District. He stated that, "[w]hile commercial uses are varied, the market would not make a distinction in land value between one use over another." See Andolfo's Report at 64.
Next, Mr. Andolfo assessed the Davol property's highest and best use when improved. Currently, a mixed-use commercial development already exists on the site. The 108,885 square-foot structure is devoted to office use. Mr. Andolfo commented that the building is "positively influenced" by the site's ability to provide 220 parking spaces, and that fact makes the property highly competitive within the market place. He further stated, "[a]s a mixed-use commercial development, the subject property is neither speculative nor conjectural and does conform to the economic character of the immediate neighborhood area." He then cited Davol's IRS Partnership Return, which demonstrated an increase in gross rents from 2001 through 2004 — as a result of Davol's changing its leasing focus to high-tech tenants.[19] Mr. Andolfo also noted that the occupancy rate of the building jumped from 60% in 2003 to 100% in 2004. Based on these findings, and "in keeping with the implied definition of the highest and best use," he concluded that the best use of the property is its current improved mixed-commercial use, including the parking lot that supports the nearby office building.
Because the gross rents of the entire Davol Complex increasedafter the easements had been acquired by NBC, Mr. Andolfo concluded that Davol did not suffer severance damages from the permanent taking. As a result, he did not employ a "before" and "after" valuation on the entire complex. *Page 24 
Mr. Andolfo then estimated the value of the permanent 7080 square-foot easement in the form of an asphalt-paved lot. Since the permanent easement did not preclude Davol from utilizing a predominant portion of its surface parking lot, and because NBC indicated that it would not be opposed to construction over the easement, so long as a fourteen foot clearance was provided, Mr. Andolfo valued the permanent easement using comparable sales of six other parking lots, or potential parking lots, in the vicinity.
Sales number one and two — 71 Ship Street and 155 Clifford Street — are located in the Jewelry District. The former is located within the D-2 zone; the latter is found in the D-150 zone. Both of these lots provide parking support to nearby buildings. Mr. Andolfo found the 71 Ship Street site particularly pertinent to assessing the Davol property. He noted that one parcel was home to a 105,000 square-foot building; the other, across the street, was a parking lot, just under one acre in area, which was purchased by Brown University. (Tr. at 488-89.) The Clifford Street property once contained an older industrial building. The building was torn down after the sale, and a parking lot was developed to support an office building across the street. Id. at 489.
Sales number three and four were utilized as parking lots at the time of their sale. Sale three, at Atwells Avenue and Broadway, is located in the D1-300 zone. Mr. Andolfo found this site particularly relevant in assessing the permanent easement's value because of its large, 36,105 square-foot size, and a zoning designation which makes it quite conducive to "large-scale development." Id. at 490. Nevertheless, he observed that since its acquisition, it has been used as a 100 space surface parking lot. Id. at 490; See also Andolfo's Report at 90. Sale four — on the waterfront at Corliss Landing and across the river in a W-2 zone — was sold as a seventy-nine car parking lot. Sale five, a lot with a building formerly occupied by the old Boy Scouts of *Page 25 
America Rhode Island Headquarters, was considered a land sale and advertised as a building site. See Andolfo's Report at 92. Sale six was for an asphalt-paved parking lot supporting forty spaces. This final sale is located on Eddy Street within the hospital district area. Both sales five and six were located in the C-2 zone.
Mr. Andolfo stated that he did not consider sales within the City's Financial District or Capital Center areas as appropriate for comparable sales due to their dissimilar and superior character. Mr. Andolfo commented that doing so would be evaluating "apples versus oranges," specifically with respect to the allowable building height and the type of office space offered. (Tr. at 493.) He noted that the Financial District is home to high-rise development and typically occupied by major Class A tenants, while the Jewelry District is essentially an industrial re-use area. Further, he associated the Capital Center area with the "new downtown." Id. Rental space in Capital Center buildings typically leases for $30 to $40 per square foot, and the rents associated with the Financial District range from $30 to $32 per square foot. In the Jewelry District, however, tenants would expect to pay only $17 to $19 per square foot. Id. at 494.
Based on these observations, Mr. Andolfo attempted to streamline the adjustment process, primarily focusing on alterations in sale price for proximity in the time of the comparable sale and zoning. The adjustments on each sale are reflected in a chart located on page 95 of Mr. Andolfo's Report. Mr. Andolfo thereafter calculated the value of the permanent easement at $36 per square foot. Consequently, he concluded the fee simple value of this taking amounted to approximately $254,000. Mr. Andolfo also concluded that because Davol retained certain rights with respect to the easement, including the right to park on the asphalt-paved ground, and because the easement is located at the site's northeast corner, fronting South Street and adjacent to Narragansett Electric's overhead electric transmission wires, its long-term impact *Page 26 
on value is mitigated. (Tr. at 491-92.) Applying a 70% imposition on fee value, Mr. Andolfo then calculated the value of the 7080 square foot permanent easement acquisition to be $178,500.
Mr. Brueckner, an engineer engaged by NBC, credibly testified that Davol did not request permission at any time from NBC to construct over the permanent easement. He stated, however, that NBC would have been amenable to such a request, provided that a fourteen-foot clearance was given over the land subject to the easement.
With respect to the temporary easement, Mr. Andolfo calculated its value using two methods. He first considered the rent differential in the traditional pre-taking Davol parking lot to the satellite lot offered by NBC. To calculate the pre-taking value of the Davol parking lot, Mr. Andolfo consulted his firm's parking lot/garage survey of the downtown Providence area and Jewelry District.[20] Thereafter, he quantified a monthly rate for a parking space as $125. He calculated the satellite lot's parking space rental value at $75 per month. This left a rental loss of $50 per space per month. At the time of his report, Mr. Andolfo provided an estimate for the loss of 82 parking spaces over a 1.33 year period — or approximately sixteen months — and he arrived at a figure of $65,500.[21]
Next, Mr. Andolfo valued the temporary easement on a rental rate of return based upon its calculated fee simple market value. He did so while accommodating an associated rental rate of return of 11%. As with the permanent easement, Mr. Andolfo used the "comparable sales" approach and applied adjustments to six properties in the area. After he made adjustments, including those that reflected zoning, and averaged the values, Mr. Andolfo concluded that the *Page 27 
area in question was worth $102,000 using this method. Mr. Andolfo chose the latter of these values to conclude that just compensation for NBC's taking of the temporary easement was $102,000.
 C Valuation of the Easements 1 Highest and Best Use
NBC avers that Davol has failed to prove that a luxury-condominium complex is the highest and best use of its property. Specifically, NBC asserts that Davol failed to prove an element necessary to establish the proposed highest and best use; namely, it failed to demonstrate that any condominium complex — whether seven stories or fourteen — would have been financially feasible. NBC cites to Gorham v. Pub. Bldg. Auth. ofthe City of Providence, 612 A.2d 708, 711 (R.I. 1992), wherein our Supreme Court held that the trial court erred in determining that the highest and best use of certain condemned land was a golf course "[d]espite the absence of any evidence concerning the actual development costs of constructing a golf course or the estimated cash flow from such a project" The Court observed that "[i]n ascertaining the fair-market value of property, one must consider such factors as developmental costs and marketability . . . Indeed, account must be taken of all factors which would be considered by a prospective purchaser. . . ."Id. at 716 (quoting U.S. v. 158.24 Acres of Land, More or Less,696 F.3d 559, 564 (8th Cir. 1982)).
"To determine the financial feasibility, the appraiser estimates the future gross income that can be expected from each use." Appraisal Institute, The Appraisal of Real Estate at 314 (12th ed.). Additionally, vacancy and collection losses are considered in calculating the net operating income of a particular use, and a supply and demand analysis is required to determine *Page 28 
whether the benefits of a use will outweigh the costs. Id. Furthermore, the physical characteristics of a property should be factored into a determination of economic feasibility. See U.S. v. 177.51 Acres of Land,More or Less, 716 F.2d 78, 84 (1st Cir. 1983) (recognizing that because 85% of tract was covered by steeply sloping land, the proposed project may not be economically feasible); See also U.S. v. 7.92 Acres of Land,More or Less, 769 F.2d 4, 12-13 (1st Cir. 1985) (finding "particularly significant that the property owner [of property lying predominantly on the face of a coastal bank] failed to show the reasonable probability that the property, at the time of the taking, was adaptable for the . . . proposed [use]").
Mr. Collins suggested that this particular development would outperform other available condominium complexes in the area. Interestingly enough, however, while the total residential sales appear to have risen by 36% in volume within the City between 1999 and 2004, the number of condominium sales appears to have decreased significantly during that period. There were 228 such sales in 2002, 67 sales in 2003, and only 57 sales in 2004. See Collins' Report at 39.
Mr. Collins testified that a market demand existed for 200 or 250 condominium units per year, and the need for condominium development in the Jewelry District was imminent. He stated that an array of other large-scale residential projects were underway in the City, and named eight that recently were developed or were in the development process. He did not, however, elaborate on the vacancies, actual or projected, if any. Such elaboration may have aided the Court in assessing his highest and best use analysis.
Mr. Collins stated that the proposed 134-unit waterfront complex would outperform the overall market. Its waterfront location, he urged, would make its marketability greater. Mr. Collins admitted, however, that certain buyers might be dissuaded from purchasing the proposed units as a result of the unattractive, high-powered, currently-existing transmission wires on the *Page 29 
property. Mr. Andolfo also commented that potential buyers would consider the aesthetic impact of these wires, as well as the potential health impacts, prior to committing to the property.
In his report, Mr. Collins stated that National Grid, owner of NBC, had agreed to bury these wires. The Court finds this assertion to be unconvincing. Mr. Collins' trial testimony demonstrates that he overestimated the probability that these wires would be buried. Mr. Collins admitted that he based his conclusion on a three-minute conversation with an attorney at National Grid who served as counsel in permitting matters; further, Mr. Collins only spoke with him concerning another project, and did not discuss obtaining a permit to bury wires on the Davol site. The Court finds that this fact directly impacts the marketability of Mr. Collins' proposed highest and best use opinion, rendering his testimony much less compelling.
Mr. Collins also did not provide a financial feasibility analysis. The Court does not find Mr. Collins' "conceptual" presentation of the property's highest and best use to be as troubling as it does his failure to consider the basic physical characteristics of the land on which this project would be constructed. In his report, Mr. Collins specifically stated that a soil analysis for the site has not been conducted. See Collins' Report at 45. Mr. Andolfo also discussed the importance of including construction costs in a financial feasibility analysis. He specifically acknowledged that an appraiser would consider the nature of the soils beneath the project site and the type of foundation that the project would accommodate. (Tr. at 481-82.)
Mr. Bamford, a geotechnical engineer engaged by NBC, credibly indicated as much to the Court through his testimony. He succinctly described the limitations of the soil beneath the Davol property, and concluded that based on the property's subsurface composition, it was unsuitable for the type of construction Mr. Collins envisioned at the site. Mr. Bamford testified that relatively inexpensive shallow footings would not be feasible at the Davol site due to its soil *Page 30 
conditions. Instead, deep foundations — such as driven piles, PIFs, or drilled shafts — would be necessary to support a seven-story structure. While these types of foundation methods have been used elsewhere in Providence, (Tr. at 692-94), Mr. Bamford estimated that their cost would range from $3 million to $4 million.
It is clear from his testimony that Mr. Collins did not inquire of this expense, although he admitted that in performing other appraisals, he had "all cost information for new construction." Id. at 140-41. When asked about the feasibility of his proposed highest and best use, he acknowledged that the value of the project and the cost flowing from its development must be equal. Id. at 361. Mr. Collins opined that the value of this particular condominium project would be 25% more than its cost.Id. With respect to the certainty of this estimate, however, Mr. Collins urged the Court to look "look around . . . [at] what's going on. You have the Inter[C]ontinental development, you had Five Memorial Drive, you had Jefferson at Providence Place, all those were being developed and had value greater . . . than cost." Id.; See also id. at 367.
The Court finds that a prudent appraiser would have recognized that the expense of deep foundations was a significant factor in a financial feasibility analysis for new development.[22] See 177.51 Acres ofLand, 716 F.2d at 84 (acknowledging "although [proposed highest and best use] would pass muster under the zoning laws, th[e] development scheme might not be economically feasible due to the physical characteristics of the tract."). The Court finds that a *Page 31 
soil analysis and a calculation of the foundation costs of the proposed highest and best use was essential to Mr. Collins' analysis, whether seven or fourteen stories high, especially in light of his statement that "the whole concept behind the highest and best use is to make the most amount of money. You develop property not just to have it worth equal to what it cost but to make a profit on it." (Tr. at 133.) Having failed to do so, the Court finds that Mr. Collins' testimony to be less credible than it might have been had he performed a more detailed analysis and certainly less compelling.
Furthermore, although Mr. Collins acknowledged that parking was essential to the Davol site, he did not consider the cost of relocating the parking that would be displaced by his proposed highest and best use. (Tr. at 202.) During cross-examination, Mr. Collins asserted that accounting for displaced parking was not part of his assignment; rather, he was charged with valuing the property "as is." He stated that post-purchase, a developer would "put in mitigation to handle all sorts of things. This is what happens in the construction process." (Tr. at 224.) The Court finds that his calculation of Davol's highest and best use was further deficient because it ignored parking, which was a material aspect of the Davol Building's continued existence. Mr. Collins' cursory dismissal of parking considerations is unsatisfactory, particularly because he asserted that a failure to provide alternative parking would result in lost rental income from the portion of the property not under construction. (Tr. at 36.)
Regardless of whether a seven-or fourteen-story building is proposed for the site, the Court observes that PHDC and CRMC approvals would be required. It is clear that Mr. Collins did not take such requirements into consideration in his highest and best use analysis for either building height. When asked why he had not factored in such regulatory requirements, he indicated that "[i]t was not my role[;]" instead, he used the permitting processes in his home state *Page 32 
to justify his failure to address these factors. He stated that "the checklist of governmental agencies and approvals that have to sign off on everything is huge, and you typically, at least in Massachusetts, go to a single source." He stated that he typically relied on professionals to handle that issue because "that's what appraisers do," and added that "timing [was] not appropriate" to inquire of these approvals since a variance had not been granted with respect to the property.
Even if Davol's proposed highest and best use was accepted by the Court, the underlying analysis employed to calculate the fair market value of the property was flawed. Mr. Collins failed to value the property as currently improved, in addition to valuing the property as vacant. (Tr. at 134.) This is important, in part, because
 as long as the value of a property as improved is greater than the value of the land as though vacant, the highest and best use is the use of the property as improved. In practice, however, a property owner who is redeveloping a parcel of land may remove an improvement even when the value of the property as improved exceeds the value of the vacant land. Investors are not likely to pay large sums of money to hold onto the property until the value of the remaining improvement has decreased to zero. The costs of demolition and any remaining improvement value are worked into the test of financial feasibility for redevelopment of land. Appraisal Institute, The Appraisal of Real Estate at 306-07 (12th ed.).
Mr. Collins' failure to assess the property as currently "improved," makes it impossible for the Court to find that Davol met its burden in proving by a preponderance that the highest and best use was not the property's current use. Based on the property's continued generation of revenue and rental income, the Court cannot accept Mr. Collins' failure to analyze the property as an improved site. Indeed, it was precisely for this reason that Mr. Andolfo concluded that the highest and best use was the property's current use. *Page 33 
Accordingly, NBC's motion for judgment as a matter of law with respect to the highest and best use of the property is granted. See
Super. R. Civ. P. 52(c). Based on the aforementioned facts and explanations offered by the experts, the Court now must assess Mr. Andolfo's appraisal value.
 III Valuation
Easements are partial acquisitions of property, whether temporary or permanent in nature. See 4 Nichols on Eminent Domain § 13.15[1] (3d rev. ed. Patrick J. Rohan and Melvin A. Reskin 2002). For valuation purposes, the portion of the property not burdened by the easement is called the "remainder" of the property. Id. Essentially, the value of an acquired easement is based upon its contribution to the value of the remainder. The value of an easement typically is measured using the three recognized approaches to value — the comparable-sales approach, the income approach, and the cost approach. See id.. In cases involving severance damages, "a single parcel admittedly exists, a portion of which has been taken, and the inquiry is whether the portion taken added or did not add value to the remainder before taking." See 4 Nichols onEminent Domain § 14B.01 (3d rev. ed. Patrick J. Rohan and Melvin A. Reskin 1999).
 A The Permanent Easement
Both experts agreed that the permanent easement did not result in severance damages to the remainder. Specifically, Mr. Andolfo credibly concluded that the property could be valued without adhering to the "before and after rule" because where no severance damage exists, it is implied that the area affected by the easement would have been valued the same both before and after the taking. (Tr. at 462-63.) *Page 34 
Mr. Andolfo considered the property as one unified tract at the time of its taking. At that point, the Davol site had not been subdivided. Mr. Andolfo explained as follows:
 you have to value the whole property because it's one property, it's a unity of ownership, unity of use and continuity of the land area. The Davol property consisted of 108,000 square feet of building area and 220 parking spaces. And part of the operation of the Davol property provided its tenancy with one parking space for every 500 square feet of building occupied. So Davol had enough parking on its site, based upon that formula, to support its tenancy.
He stated that the on-site parking was critical, for without the parking, Davol's financial success would be jeopardized because it could not attract tenants and retain them long-term. He also reasoned that even if an appraiser considered the May 25, 2005 subdivision relevant to the site's highest and best use analysis, it still must be valued as a single area having a single use.[23] Mr. Andolfo credibly testified that the removal of parking facilities from the Davol site would result in severance damage to the building. Therefore, the parking area, although subdivided post-taking, still belonged to a "whole, connected property," because it was necessary to make the building economically functional. Mr. Andolfo opined that the parking area could not be considered merely excess land because it could not have a separate highest and best use.
As discussed supra, Mr. Andolfo concluded that the existing commercial use was its highest and best use by virtue of its occupancy rate and revenue. Mr. Andolfo disagreed with Mr. Collins' assertion that parking on the parcel was only an interim use. Indeed, the fact that the property currently supports a productive, income-producing building, with parking, necessarily detracts from Davol's claim that parking is an interim use. Further, while Davol criticizes Mr. Andolfo for his admission that the Davol's surface lot could support additional commercial development provided that additional parking is provided to support the existing *Page 35 
buildings, Mr. Collins also conceded that sufficient parking is required for the operation of the existing office space on the property.
Merely because Mr. Andolfo stated that the parcel could support additional construction does not necessarily mean that it would have been an economically feasible option in the near future. Davol contended that the Old Harbor Plan solidified its assertion that the property would be ideal for commercial development, particularly the development of a luxury-condominium complex. Mr. Andolfo explained that little risk typically is involved with parking lots, but that great risk is associated with property development.
Davol also faulted Mr. Andolfo for stating that the Jewelry District was virtually 100% built up, while failing to recognize that the Old Harbor Plan provided a comprehensive development scheme for the area. Davol pointed out that the Old Harbor Plan projected that a garage would be built on the existing surface parking lot to promote "Davol Square waterfront expansion." Mr. Andolfo stated that in fact he did consider the Old Harbor Plan, and he recognized that the I-195 plan would increase the Jewelry District's connection to the downtown area; however, he also observed that no condominiums have been built in the Jewelry District since the plan was released in 1992. In fact, during his testimony, Mr. Andolfo convinced the Court that much of the development ideas proposed in the Old Harbor Plan had not been fulfilled. This further bolsters the Court's opinion that Mr. Collins' testimony regarding the risk of condominium development on the parcel was not compelling. In contrast, Mr. Andolfo's straight-forward description of the property's current status provided the Court with a professional, credible, and compelling account of the property's highest and best use.
In determining the damages Davol suffered as a result of the permanent easement, Mr. Andolfo considered the comparable sales of six properties in the nearby vicinity — the furthest *Page 36 
being 0.73 mile from the property. Mr. Andolfo explained that location was a strong factor in his assessment; he felt that the Capital Center and Financial District areas were vastly different from the Jewelry District. Each sale occurred within the time frame spanning September 2003 through November 2004. Mr. Andolfo stressed the importance of adjusting the sales prices of these properties to reflect the applicable zoning restrictions and the relative proximity of said properties to the Davol property.
Mr. Andolfo's highest and best use analysis markedly contrasted with that proposed by Mr. Collins. His use of comparables also markedly contrasted with those used by Mr. Collins, because Mr. Andolfo refused to consider sales in the more-desirable and much-superior Capital Center and Financial District locations. Mr. Andolfo clarified that the parking lot sale comparables could support future development if the purchaser so desired. Mr. Andolfo also explained that this is why he adjusted the price per square foot to accommodate each comparable parking lot's zoning designation. He stated that merely because a sale of a parking lot occurred, it would not preclude the lot from being developed in the future.
While Davol criticized Mr. Andolfo for failing to value more than one "waterfront" property, the Court finds that in aggregate, the sales he chose were sufficiently similar to the subject property in size, location, and use. Sale number one — Ship Street — was comprised of approximately 42,589 square feet, and thereby just under the size of the Davol property. It is irregularly shaped, like the Davol property, and it also is adjacent to I-195. This site supports an office building of approximately 102,000 square feet, not unlike the Davol property. Mr. Andolfo valued this site at $35.22 per square foot. The second sale is also in the Jewelry District, but is significantly smaller and has a "better" zoning designation. Consequently, Mr. *Page 37 
Andolfo adjusted the value of this site by 30%, to arrive at an adjusted sales price of $36.86 per square foot.
Sale three, in the D-1/300 zoning district, sits on 36,105 square feet of land and serves as a paved parking lot. Its sale price, $69.24, was adjusted downward 50% because of its more desirable zoning designation (resulting in a $34.62 per square foot value). In his report, Mr. Andolfo observed that this property was in the upper-downtown area at I-95. He recognized that the owner publicly relayed his plans to construct a high-rise condominium at the site, but that as of the date of his report, it remained a parking lot.
Despite these potential development plans, the site still sold for a value consistent with others serving the same purpose in the area. Mr. Andolfo testified that sale four was subject to a below-market lease; however, there is no indication as to why this fact would affect its value. The overall net adjustment on its $30.86 per square foot sale price was positive 5%, yielding a value of $34.28 per square foot. The property, which sold at this price, had a water view of the Providence River and Old Harbor Marina.
Sale five at 175 Broad Street involved a 50,486 square-foot property, also similar in size to the Davol site. It, too, is located near a major highway — Route 95. Mr. Andolfo recognized that this property is now advertised for resale as a building site, but initially sold at an unadjusted sale price of $34.43. He adjusted this figure upward by 10% for its more desirable C-2 zoning classification, and arrived at a per square foot value of $37.87. Mr. Andolfo was questioned about his use of sale six at 671-681 Eddy Street. This lot was small in comparison to the Davol site, at 10,810 square feet, but Mr. Andolfo confirmed that it was a parking lot sale to service Women Infants' Hospital. *Page 38 
Mr. Andolfo explained that all of the chosen comparables depict the fee simple market value for the subject site regardless of what their use is. He testified that the highest use of each comparable is a commercial use; this is the same highest use that the subject site would have if vacant. This is also the Davol site's current use. The Court finds that the comparable sales chosen by Mr. Andolfo more accurately reflect the nature and characteristics of the Davol property because they were in the immediate vicinity of the property, were made close in time to the acquisition of the permanent easement, and reflect the fact that the comparables could support future development, if desired. Therefore, the Court adopts the value of the land subject to the permanent easement, $36 per square foot, as assessed by Mr. Andolfo. In doing so, it observes that all of the comparable sales utilized by Mr. Andolfo yielded prices in close range of one another varying only from $34.28 to $37.87 per square foot.
Mr. Andolfo's conclusion as to the permanent easement's 70% imposition on the property's fee value is also well-supported by the record. He credibly testified that the permanent easement acquired by NBC only minimally affects the property's existing commercial use. Further, he concluded that the location of the permanent easement, fronting South Street and adjacent to NEC's overhead electric transmission lines, mitigate the taking's long-term impact on the property's value. The Court, therefore, concludes that just compensation for the 7080 square-foot permanent acquisition of an easement over Davol's property is valued accurately at $254,880.
 B The Temporary Easement
Both parties also presented evidence to the Court regarding the value of the temporary 19,326 square foot easement, where 95 parking spaces for the Davol Building's tenants were *Page 39 
displaced as a result of construction. The temporary taking occurred between April 4, 2003, and August 18, 2004, approximately 16.5 months.
Mr. Collins produced a "before and after" valuation with respect to the monthly rental value of the spaces taken. (Tr. at 120.) He stated that the rent differential was $75 per space, and applied a 5% vacancy discount, plus a discount for expenses. He calculated the value of the temporary easement, using a total of 95 temporarily displaced parking spaces, to result in damages of approximately $94,180 — a figure which reflected the applicable vacancy discount and expenses. See Collins' Report at 80-81.
Mr. Andolfo calculated his value using two methods. He, too, analyzed the lost rental value, and concluded that the difference in value of each space was $50 per space per month. At the time of his report, Mr. Andolfo provided an estimate for the loss of 82 parking spaces over a 1.33 year period, or approximately 16 months, of $65,500. He later altered this calculation to reflect a loss of 95 spaces for a period of 16.5 months, and concluded that the damages amounted to be approximately $78,375. See Andolfo's Report at 84.
Mr. Andolfo then valued the easement on a rental rate of return based upon its calculated fee-simple market value. Mr. Andolfo used the "comparable sales" approach and applied adjustments to six properties in the area. After he made the adjustments, he calculated a value of $102,000 for sixteen months. Taking into account the fact that the temporary taking actually was 16.5 months, the Court finds that an amended calculation would reflect damages in the amount of approximately $108,100. See id. at 98.
In his report, Mr. Andolfo recommended the higher value as Davol's just compensation because "[c]ommonly, the measure of damages as relating to the taking of a temporary construction easement is based on the economic rent of the affected area, or the time period or *Page 40 
term of the temporary easement. Typically, if rental data is unavailable, an appropriate rate of return on the land for the term of the easement is customarily estimated." See id. at 86.
Just as the Court found the comparable-sales approach utilized by Mr. Andolfo in calculating the permanent easement's fair market value to be reasonable and appropriate, it also finds the same approach to be reasonable and appropriate in calculating the temporary easement's fair market value. The Court, therefore, concludes that $108,100 was the fair market value of the 19,326 square foot temporary easement that was imposed upon Davol's property during the construction of the sewer project.[24]
 V Conclusion
The Court concludes that the Narragansett Bay Commission has proven by a preponderance of the evidence that the highest and best use of petitioner's property, at the time of its taking, was its then-current use; namely, parking support for a mixed commercial development. The Court further concludes that its fair market value of the permanent easement was $178,500 and the value of the temporary easement was $108,100. In addition to the cost of the temporary easement, petitioners are entitled to compensation for the cost of hiring a parking *Page 41 
lot attendant at the satellite parking lot in the amount of $73,440. Consequently, the total just compensation to be awarded to Davol is $360,040 less the compensation already received by it in the amount of $264,690, thereby totaling $95,350, with interest, from the date of the temporary and permanent takings.
Judgment may enter reflecting that Davol has received just compensation for its property. Counsel shall submit an appropriate order for entry.
[1] The Jewelry District is a Providence neighborhood described as follows: "bound by downtown on the north, the harbor on the south, Providence River on the east, and 195 on the west." (Tr. at 129-30.)
[2] As a result of vibrations arising from pile driving that took place near the Goff Building, the building itself suffered structural damage. It was rendered unusable, and demolished after obtaining the necessary permissions from the Providence Historical District Commission (PHDC). Prior to demolition, the Goff building contained approximately 1300 square feet in area, and the entire 7500 foot premises was leased to the Free Clear Company. The building served as a bar and restaurant. The lease term ended on August 31, 2005, and per the lease, Davol was to provide 40 parking spaces for this building each day after 5:00 p.m. Davol had no indication that the tenant would end its lease prior to the scheduled August 31, 2005 termination date.
[3] During trial, Davol's expert appraiser testified that River House, LLC is the "development entity for the development parcel." (Tr. at 364.)
[4] The permanent easement provides: "[W]ithout the prior written consent of Commission, the landowner, its successors and assigns shall not perform any construction, make or install any improvements, pave, build or erect a wall or structure of any kind, or plant trees or shrubs, store any heavy equipment or material or fill, excavate or remove soil within the easement area; provided, however, the only reason the Commission not giving its approval shall be that such construction, improvement, storage, filling, excavation or removal or the like will interfere or likely interfere with the use of the easement or the ability to inspect, reconstruct, repair, replace, renew or maintain the sewer line and appurtenant structures or cause or be likely to cause damage to the facilities."
[5] Construction in the temporary easement area initially was predicted to last eighteen months.
[6] Mr. Andolfo's initial appraisal, drafted on September 25, 2002, effective as of August 2002, and notarized on October 9, 2002, estimated the $264,690 figure based on a square footage that later was revised upwards. The revised square footage is reflected in his full appraisal report, dated January 18, 2007. It estimated Davol's compensation at $280,500.
[7] In permitting this testimony, the Court noted that, at that time, NBC neither had demonstrated that Mr. Collins improperly used the standard methodology utilized by his profession, nor had it demonstrated that Mr. Collins could not establish a reasonable probability of obtaining zoning relief.
[8] The Court also rejected Davol's insistence that it rely on a Maryland case permitting consideration of diminution of the fair market value of a property, including lost rental income, in the period prior to a taking. It noted that the Maryland case interpreted a statute which has no equivalent in Rhode Island.
[9] NBC has already compensated Davol in the amount of $264,690. Davol's figure of $1,681,000 includes its estimate of the value of the permanent easement ($1,575,000) and the value of the temporary easement ($106,000).
[10] This highest and best use estimate assumes that Davol would receive zoning relief from the seven-story height restriction.
[11] Section 420.4 of the Providence Zoning Ordinance provides as follows:
 The Board, upon application for a variance, as provided in section 902.3, may increase the maximum height allowed in this ordinance by twenty-five (25) percent, but to no more than three hundred (300) feet, whichever is less, provided the use of the building is in conformance with Article III. (Emphasis added.)
[12] Davol presented evidence that a height variance was granted to the Heritage Harbor Corporation in 2006, with respect to 350 Eddy Street. The Court does not find this fact probative of the potential for obtaining a zoning variance on the Davol property. The eighteen foot height variance issued to the owners of 350 Eddy Street accommodated a mechanical structure on the roof of a building that had a pre-existing nonconforming height.
[13] During his trial testimony, Mr. Collins indicated that he also considered a variance granted in conjunction with the construction of the InterContinental Hotel. Mr. Collins, however, could not comment on the process by which the additional height was allowed, nor could he reconcile the fact that the property, as a comparable, was located in a more desirable location.
[14] While Mr. Collins may have spoken with individuals he believed possessed expertise in property development and investment, he did not discuss the potential for obtaining a height variance with zoning officials or others with special knowledge in this area. Though this fact is relevant to the instant matter, it is not determinative of the Court's finding on probability. An appraiser's opinion may be based on his or her own observations or knowledge of zoning changes in the immediate vicinity of the property, or a particular development trend in a certain area. See Palazzi v. State, 113 R.I. 218, 227, 319 A.2d 658,663-64 (1974). It cannot, however, be based upon a "personal belief that at some future time conditions might develop in the area that would bring about [change]." Id. at 227, 319 A.2d at 663. The Court is satisfied that Mr. Collins relied on conversations with others in the real estate development industry before relaying his opinion on the potential change of height restrictions for the subject property; however, the Court finds that this information was relayed on an informal basis and only was discussed generally, not specifically, with the Davol property in mind. Therefore, it is not compelling.
[15] Mr. Richard Jaffe, an Executive Vice President of Davol Square Jewelry Mart, LLC, attributed the rise in tenancy to the newfound "certainty" in condemnation plans; he credited "definitive answers" to inquiries regarding the temporary and permanent easements in accounting for the rise in occupancy. Much of these "answers" related to availability of parking for Davol's tenants.
[16] The "floor area ratio" (FAR) methodology accounts for a site's ability to support multi-story development. Mr. Collins described it as the entire square footage available for development upwards from a particular building footprint.
[17] Mr. Collins used two comparables to determine the "after" value. He first considered 181 Chestnut, which was a 1997 Jewelry District parking lot sale. Adjusted, the suggested value was $26.37 per square foot. He next considered a long and narrow piece of land which was purchased by an abutter for parking. Adjusting for the more desirable South Main Street location, Mr. Collins calculated a suggested $26.22 square foot value. The average of these figures, $26.30 was multiplied by 7080 square feet to obtain an "after" value of $186,000. Alternatively, if used as a buffer between a walkway and the river, the value would be approximately $212,000. Therefore, giving weight to each, Mr. Collins arrived at an "after" value of $200,000.
[18] In calculating this fair-market rental value, Mr. Collins conducted interviews with local parking providers, as well consulting a text published by the Urban Land Institute. He also considered the parking prices in city-owned garages and a survey compiled by Standard Parking, a leading company in the parking industry.
[19] Mr. Andolfo cited no less than seven newspaper articles, which described the ongoing growth in the area of the Davol property and the increase in demand for office space in Providence.
[20] Four "comparable" lots were used to assist in valuing the Davol lot. Three "comparables" were used in assessing the value of the NEC-provided satellite parking lot. See Mr. Andolfo's Report at 84-85.
[21] Mr. Collins' calculation was based on Davol's temporary loss of 105 parking spaces. Mr. Andolfo's initial calculation was based on a loss of 82 parking spaces. Mr. Brueckner credibly testified that the number of spaces temporarily lost actually was 95. He determined this figure after examining aerial overlay photographs of the site, and the Court accepts this number as being the most accurate.
[22] Notably, Mr. Collins stated that a cantilevered building, which would provide approximately two stories of air space above the permanent easement, would not be an economically feasible construction option on the Davol property. He noted that the steel alone would cost approximately $500,000 to $600,000 dollars, and further indicated that the additional construction time associated with a cantilevered structure would be unfavorable to developers. The Court finds Mr. Collins' detailed conclusion as to the infeasibility of a cantilevered structure surprising, particularly because he failed to consider a potential $3 to $4 million expenditure on foundation costs on the Davol site as a factor in his financial feasibility analysis. Further, Mr. Tidwell, an architect engaged by NBC, testified that the time it would take to construct a cantilevered building would be no different than the time required to construct a non-cantilevered structure.
[23] "Once the unity of use has been established, despite the existence of separate legal parcels, the two tracts become for the purposes of analysis of damage a single tract. . . ." 4 Nichols onEminent Domain § 14B.01 (3d rev. ed. Patrick J. Rohan and Melvin A. Reskin 1999).
[24] Had the Court not accepted Mr. Andolfo's alternate calculation regarding the value of the temporary easement, it still would have found his opinion, and use of comparable "rental" properties, persuasive in determining the fair market value of the temporary easement. While both experts determined that the rental value of the parking spaces pre-taking was $125 per month, their post-taking rental valuations differed. Mr. Collins concluded that the satellite lot spaces were valued at $50 per month. To support this valuation, Mr. Collins cited his interview of the manager of 198 Dyer Street. This manager apparently provided Mr. Collins with information about the lot adjoining the 198 Dyer Street, the details of which aided Mr. Collins in forming his opinion. Mr. Collins learned that the adjoining lot provided 317 spaces, free of charge, to state employees. Additionally, it provided 165 spaces for the general public. Mr. Collins stated that the walk from this lot to the state buildings is approximately five to six blocks. Using that information, Mr. Collins concluded that an "incentive" had been created, which he valued at 60%, to entice a tenant to have its employees walk from an off-site location. He then used this incentive to calculate a $50 per space per month rental value for the satellite lot.
Unlike Mr. Collins, who based his "after" rental value on a single property that supplied so much free parking to state employees, Mr. Andolfo reached his conclusion by examining the rental values of three private lots in the vicinity of the property, the first at Chestnut, South, and Richmond Streets; the second at the northwest corner of Chestnut and Basset Streets; and the third at 173-181 Chestnut Street. He supplied the Court with a map of these locations, all of which were in the nearby vicinity of the property. It appears as though none of these lots went beyond Davol's side of I-195, and despite their varied, but nearby locations, each produced a per-space monthly rental value of $75.